Gene Y. Kang, Esq.
Timothy J. Bang, Esq.
Barry I. Levy, Esq. (to be admitted *pro hac vice*)
Max Gershenoff, Esq. (to be admitted *pro hac vice*)
Steven Henesy, Esq. (to be admitted *pro hac vice*)
RIVKIN RADLER LLP
25 Main Street, Suite 501
Court Plaza North
Hackensack, New Jersey 07601
(201) 287-2460
gene.kang@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance*
*Co., GEICO Indemnity Co., GEICO General Insurance*
*Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO.,<br><br>           Plaintiffs,<br><br>   -against-<br><br>TOTOWA CENTER FOR PAIN MANAGEMENT & PHYSICAL MEDICINE, P.C., DAVID FONTANELLA, D.C., JOSEPH HAYEK, D.C., CHERYL CRUZ, L.Ac., SPECIALTY MEDICAL SERVICES, L.L.C., LOUIS GIASULLO, D.C., SALVATORE MILAZZO, D.O., and SALVATORE SANTANGELO, D.C.,<br><br>           Defendants. | Case No.<br><br><br>**Plaintiffs Demand a Trial by Jury** |

**COMPLAINT**

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

**NATURE OF THE ACTION**

1.      This action seeks to recover more than $1,100,000.00 that the Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted:

(i)      thousands of fraudulent no-fault insurance charges through Totowa Center for Pain Management & Physical Medicine, P.C. ("Totowa Pain") for purported initial examinations, follow-up examinations, chiropractic treatment, physical therapy treatment, and acupuncture services; and

(ii)     hundreds of fraudulent no-fault insurance charges through Specialty Medical Services, L.L.C. ("Specialty Medical") for purported initial examinations, follow-up examinations, electrodiagnostic ("EDX") testing, and chiropractic treatment.

(the purported initial examinations, follow-up examinations, EDX testing, chiropractic treatment, physical therapy treatment, and acupuncture services are collectively referred to hereinafter as the "Fraudulent Services").

2.      The Fraudulent Services purportedly were provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3.      In addition, GEICO seeks a declaration that Totowa Pain and Specialty Medical were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, because:

(i)      the Fraudulent Services were not medically necessary, and were provided – to the extent that they were performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)     in many cases, the Fraudulent Services never were provided in the first instance;

(iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(iv)    the Defendants were engaged in unlawful referral schemes.

4.    The Defendants fall into the following categories:

(i)    Defendant David Fontanella, D.C. ("Fontanella") is a chiropractor licensed to practice chiropractic in New Jersey, owned and controlled Totowa Pain, and purported to perform many of the Fraudulent Services at Totowa Pain.

(ii)    Defendant Totowa Pain is a New Jersey chiropractic professional corporation through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

(iii)    Defendants Joseph Hayek, D.C. ("Hayek") and Cheryl Cruz, L.Ac. ("Cruz") are, respectively, a chiropractor licensed to practice chiropractic in New Jersey and an acupuncturist licensed to practice acupuncture in New Jersey, who both purported to perform many of the Fraudulent Services at Totowa Pain.

(iv)    Defendant Specialty Medical is a New Jersey medical professional limited liability company through which many of the Fraudulent Services were performed and billed to automobile insurance companies, including GEICO.

(v)    Defendant Louis Giasullo, D.C. ("Giasullo") is a chiropractor licensed to practice chiropractic in New Jersey and purported to be the co-owner of Specialty Medical.

(vi)    Defendant Salvatore J. Milazzo, D.O. ("Milazzo") is a physician licensed to practice medicine in New Jersey, purported to be the co-owner of Specialty Medical, and purported to perform many of the Fraudulent Services at Specialty Medical.

(vii)    Defendant Salvatore Santangelo, D.C. ("Santangelo") is a chiropractor licensed to practice chiropractic in New Jersey, and purported to perform many of the Fraudulent Services at Specialty Medical.

5.    As discussed below, the Defendants at all relevant times have known that:

(i)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    in many cases, the Fraudulent Services never were provided in the first instance;

(iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(iv)    the Defendants were engaged in unlawful referral schemes.

6.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed or caused to be billed to GEICO. The charts annexed hereto as Exhibits "1" and "2" set forth a large representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

7.    The Defendants' fraudulent scheme began as early as 2013 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $1,100,000.00.

## THE PARTIES

### I.    Plaintiffs

8.    Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New Jersey.

### II.    Defendants

9.    Defendant Fontanella resides in and is a citizen of New Jersey. Fontanella was licensed to practice chiropractic in New Jersey on or about February 22, 1995, owned and controlled Totowa Pain, purported to provide many of the Fraudulent Services at Totowa Pain, and used Totowa Pain as a vehicle to submit fraudulent billing to GEICO.

10.    Defendant Totowa Pain is a New Jersey chiropractic professional corporation with its principal place of business in New Jersey. Totowa Pain was incorporated in New Jersey on or

about January 27, 1998, had Fontanella as its owner, and was used by Fontanella as a vehicle to submit fraudulent billing to GEICO.

11.     Defendant Hayek resides in and is a citizen of New Jersey. Hayek was licensed to practice chiropractic in New Jersey on or about September 4, 1996, and purported to provide many of the Fraudulent Services on behalf of Totowa Pain in exchange for compensation from Totowa Pain.

12.     Defendant Cruz resides in and is a citizen of New Jersey. Cruz was licensed to practice acupuncture in New Jersey on or about September 13, 2011, and purported to provide many of the Fraudulent Services on behalf of Totowa Pain in exchange for compensation from Totowa Pain.

13.     Defendant Specialty Medical is a New Jersey medical professional limited liability company with its principal place of business in New Jersey. Specialty Medical was organized in New Jersey on or about March 14, 2008, had Giasullo and Milazzo as its purported owners and members, and was used by Giasullo and Milazzo as a vehicle to submit fraudulent billing to GEICO.

14.     Defendant Giasullo resides in and is a citizen of New Jersey. Giasullo was licensed to practice chiropractic in New Jersey on or about January 30, 1976, was a co-owner and member of Specialty Medical, and used Specialty Medical as a vehicle to submit fraudulent billing to GEICO.

15.     Defendant Milazzo resides in and is a citizen of New Jersey. Milazzo was licensed to practice medicine in New Jersey on July 1, 1987, purported to be the co-owner and member of Specialty Medical, purported to perform many of the Fraudulent Services at Specialty Medical, and used Specialty Medical as a vehicle to submit fraudulent billing to GEICO.

16.     Defendant Santangelo resides in and is a citizen of New Jersey. Santangelo was licensed to practice chiropractic in New Jersey on April 1, 1987, and purported to perform many of the Fraudulent Services at Specialty Medical in exchange for compensation from Specialty Medical.

**III.     Cliffside MRI, the Davits, and Alexander Dimeo**

17.     Although they have not been named as Defendants in this action, Cliffside Park Imaging & Diagnostic Center, L.L.C. ("Cliffside MRI"), its owners Samuel Davit, Michael Davit, and Esther Davit (collectively "the Davits"), and Alexander Dimeo, D.C. ("Dimeo") are relevant to understanding the claims in this action.

18.     Cliffside MRI is a New Jersey limited liability company that was licensed as an "ambulatory care facility", as that term is defined under N.J.A.C. 8:43A-1.3.

19.     Cliffside MRI was, at all relevant times, owned and/or controlled by the Davits.

20.     Before he became one of the owners of Cliffside MRI, Samuel Davit had been licensed to practice medicine in New Jersey. However, Samuel Davit's medical license was revoked in 2002 by the New Jersey State Board of Medical Examiners (the "Board of Medical Examiners"). The Board of Medical Examiners revoked Samuel Davit's license to practice medicine following an administrative complaint filed by the Attorney General of New Jersey, alleging that, from 1996 to 2002, Samuel Davit engaged in an extensive scheme to commit healthcare fraud.

21.     Specifically, Samuel Davit was alleged to have provided medically unnecessary tests, made representations regarding the results of those tests that were "grossly incompetent and/or fraudulent", issued improper diagnoses based on the purported "results" of those tests, and claimed to have performed tests that were not actually performed.

22.     Following a review of the allegations in the Attorney General's complaint, the Board of Medical Examiners revoked Samuel Davit's license to practice medicine in New Jersey, imposed civil penalties, costs, and fees totaling more than $100,000.00, and imposed numerous other penalties and restrictions on Samuel Davit.

23.     Cliffside MRI purported to provide radiology services, including x-rays and magnetic resonance imaging ("MRIs"), to GEICO Insureds, pursuant to referrals from other healthcare providers, including Totowa Pain and Fontanella.

24.     Cliffside MRI and the Davits' ability to bill GEICO and other New Jersey automobile insurers for radiology services depended on Cliffside MRI's ability to gain access to Insureds.

25.     Accordingly, the Davits and Cliffside MRI devised a fraudulent kickback and referral scheme whereby they would pay illegal kickbacks to healthcare providers – including, upon information and belief, Totowa Pain and Fontanella – in exchange for patient referrals to Cliffside MRI.

26.     The payment of kickbacks in exchange for patient referrals was the regular way in which the Davits operated Cliffside MRI. For example, on or about May 20, 2016, in a case entitled State of New Jersey v. Alexander Dimeo, Docket Nos. 16-05-000251 and 16-05-000252, Dimeo – who, at the time, was a licensed chiropractor – pleaded guilty to various insurance fraud-related crimes. As part of his plea agreement, Dimeo provided sworn testimony regarding his receipt of kickbacks from various healthcare providers in New Jersey, including Cliffside MRI and Samuel Davit.

27.     Specifically, Dimeo testified that, from 2009 to late 2015, he received payments from Samuel Davit in the amount of $100.00 for each patient whom he referred to Cliffside MRI

or another MRI facility owned by the Davits, Ironbound M.R.I., L.L.C. ("Ironbound MRI"). Dimeo further testified that the aggregate amount of the kickbacks was approximately $50,000.00.

Dimeo's testimony further indicated that:

(i)     In 2009, Dimeo was approached by Samuel Davit and Michael Davit, who offered to pay Dimeo $100.00 each time Dimeo referred a patient to Cliffside MRI or Ironbound MRI for an MRI.

(ii)    Between 2009 and 2015, Dimeo referred patients to Cliffside MRI or Ironbound MRI in exchange for kickbacks from Samuel Davit, Michael Davit, Cliffside MRI, and Ironbound MRI.

(iii)   Samuel Davit would deliver the kickbacks to Dimeo on a monthly basis, in the form of $100.00 bills contained in an envelope.

(iv)    All told, between 2009 and 2015, Samuel Davit, Michael Davit, Cliffside MRI, and Ironbound MRI paid Dimeo approximately $50,000.00 in kickbacks in exchange for patient referrals to Cliffside MRI and Ironbound MRI.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

29.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

30.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

31.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the District of New Jersey is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

<u>**ALLEGATIONS COMMON TO ALL CLAIMS**</u>

**I.**     <u>**An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**</u>

**A.**     **The New Jersey No-Fault Laws**

32.     New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Compulsory Insurance Law (<u>N.J.S.A.</u> 39:6B–1 to 3) and the Automobile Reparation Reform Act (<u>N.J.S.A.</u> 39:6A–1 et <u>seq</u>.)(collectively referred to as the "No Fault Laws"), which require automobile insurers to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

33.     Under the No Fault Laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Healthcare Financing Administration insurance claim form (known as the "HCFA–1500 form").

**B.**     **No-Fault Reimbursement and Compliance With New Jersey Law Governing Healthcare Practice**

34.     In order for a healthcare services provider to be eligible to receive PIP Benefits, it must comply with all significant laws and regulations governing healthcare practice in New Jersey.

35.     Thus, a healthcare services provider is not entitled to receive PIP Benefits where it has failed to comply with all significant statutory and regulatory requirements governing healthcare practice in New Jersey, whether or not the underlying services were medically necessary.

36.     Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all significant laws and regulations governing healthcare practice in New Jersey.

37.     By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers that are not in compliance with all significant statutory and regulatory requirements governing healthcare practice in New Jersey.

38.     Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits for healthcare services that are not rendered in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

**C.     Pertinent New Jersey Law Regarding the Payment or Receipt of Compensation in Exchange for Patient Referrals**

39.     Pursuant to N.J.A.C. 13:35-6.17, physicians are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

40.     Among other things, N.J.A.C. 13:35-6.17(c)(1) specifies that:

<u>A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including</u>: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or <u>making or receiving a referral to or from another for professional services</u>. For example, a licensee who refers a patient to a healthcare service (such as a cardiac rehabilitation service or a provider of durable medical equipment or a provider of testing services) shall not accept from nor give to the healthcare service a fee directly or indirectly in connection with the referral, whether denominated as a referral or prescription fee or consulting or supervision fee or space leasing in which to render the services (other than as permitted in (h) below), or by any other name … .

(Emphasis added).

41.     N.J.A.C. 13:35-6.17(c)(1)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

42.     In keeping with the broad anti-kickback prohibitions in N.J.A.C. 13:35-6.17(c)(1), N.J.A.C. 13:35-6.17(h) provides, in pertinent part, that:

> A Board licensee may lease space or medical equipment to or from another licensed health care professional to whom patients are referred, only where rent is a fixed fee set in advance and determined by the fair market value, or less, and is for a regular term and not for sporadic use of the space.

43.     Similarly, pursuant to N.J.A.C. 13:44E-2.6, chiropractors are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

44.     In keeping with the general proscription against the payment of compensation in exchange for patient referrals (see N.J.A.C. 13:35-6.17; N.J.A.C. 13:44E-2.6), and the specific provisions of N.J.A.C. 13:35-6.17 that are aimed at preventing illegal referral fees from being disguised as ostensibly-legitimate "rent" payments (see N.J.A.C. 13:35-6.17(h)), N.J.A.C. 13:44E-3.9 provides – in pertinent part – that:

> A chiropractic physician requesting that another chiropractic physician or other practitioner perform any diagnostic tests shall … [n]ot refer a patient to another practitioner practicing at the same premises …, unless: … [t]hat other practitioner is a bona fide partner, fellow shareholder of a professional service corporation or other permitted practice structure, or a regularly salaried practitioner-employee of the chiropractic physician requesting the performance of a diagnostic test … .

45.     N.J.A.C. 13:44E-3.1 defines "practitioner" as "a licensee of a professional board authorized to render health care services, including, but not limited to, chiropractic physicians, medical doctors, podiatric physicians, physical therapists and registered professional nurses."

46.     N.J.A.C. 13:44E-3.1 defines "diagnostic test" to include "a professional service utilizing biomechanical, neurological, neurodiagnostic, radiological, vascular or any means, other than bioanalysis, intended to assist in establishing a diagnosis, for the purpose of recommending a course of treatment for the tested patient to be implemented by a chiropractic physician or other treating practitioner."

11

47.     Thus, pursuant to N.J.A.C. 13:44E-3.9, a chiropractor may not refer a patient to a physician practicing at the same premises as the chiropractor, for any types of professional services other than bioanalysis that are aimed at establishing a diagnosis for use in recommending a course of treatment, unless the physician actually is the chiropractor's bona fide partner, fellow shareholder in a professional entity, or regularly salaried employee.

48.     Physicians, chiropractors, medical practices, and chiropractic practices that pay or receive compensation in exchange for patient referrals or otherwise engage in unlawful referral schemes are not eligible to receive PIP Benefits.

**D.     New Jersey Law Prohibiting Self-Referrals**

49.     In New Jersey, with limited exceptions that are not applicable here, "practitioners" generally may not refer patients to a healthcare practice in which they have a "significant beneficial interest".

50.     Specifically, N.J.S.A. 45:9–22.5 (the "Codey Law") provides – in pertinent part – that:

> A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a health care service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest ....

51.     Pursuant to N.J.S.A. 45:9–22.4:

> "Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

> "Health care service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Health care service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home health care agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

"Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

52.     However, pursuant to N.J.S.A. 45:9–22–5(c)(1), the Codey Law's restrictions on

patient referrals do not apply to:

medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office … .

53.     Physicians and medical practices in New Jersey that engage in self-referral

arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

**E.     No-Fault Reimbursement, Medical Necessity, and the New Jersey No-Fault Care Paths**

54.     Pursuant to N.J.S.A. 39:6A–4, an insurer such as GEICO is only required to pay

PIP Benefits for reasonable, necessary, and appropriate treatment. At the same time, a healthcare

services provider is only eligible to receive PIP Benefits for medically necessary services.

55.     Pursuant to N.J.S.A. 39:6A–2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury

(i)      is not primarily for the convenience of the injured person or provider;

(ii)     is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization; and

(iii)    does not involve unnecessary diagnostic testing.

56.     Pursuant to the No-Fault Laws, the New Jersey Commissioner of Banking and

Insurance (the "Commissioner") has designated specific care paths (the "Care Paths") as the

standard course of medically necessary treatment for certain types of neck and back soft tissue injuries that commonly are sustained in automobile accidents. See N.J.A.C. 11:3–4.6.

57.     Specifically, the Commissioner has promulgated Care Paths for the following types of injuries:

(i)     cervical spine strains, sprains, and contusions;

(ii)    cervical herniated disks or radiculopathies;

(iii)   thoracic spine strains, sprains, and contusions;

(iv)    thoracic herniated disks or radiculopathies;

(v)     lumbar–sacral spine strains, sprains, and contusions; and

(vi)    lumbar–sacral herniated disks or radiculopathies.

58.     The Care Paths generally provide for an initial, four–week course of conservative treatment including chiropractic services, physical therapy, medication, and exercise.

59.     Should a healthcare services provider wish to provide additional treatment to an Insured beyond the initial four weeks of conservative treatment, the Care Paths require the provider to demonstrate at the four week mark, the eight week mark, and the 13 week mark that continued treatment is warranted based on the Insured's individual circumstances. See New Jersey Department of Banking and Insurance Comments, 30 N.J.R. 4401(a).

60.     The guidelines established by the Commissioner in the Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months and years, without any observable improvement. See 30 N.J.R. 4401(a).

**F.      The Fee Schedule and Current Procedural Terminology Codes**

61.     New Jersey has established a medical fee schedule (the "Fee Schedule") that is applicable to claims for PIP Benefits.

62.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

63.     The No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A–4.6; N.J.A.C. 11:3–29.6.

64.     The New Jersey Administrative Code provides that the Fee Schedule shall be interpreted in accordance with the Medicare Claims Processing Manual ("MCPM"), the National Correct Coding Initiative ("NCCI") Policy Manual, and the American Medical Association's CPT Assistant (the "CPT Assistant").

65.     Additionally, healthcare providers and insurers are directed to use the NCCI "Edits" in determining whether or not CPT codes must be bundled or can be billed separately, i.e., unbundled. The NCCI Edits define when two CPT codes should not be reported together either in all situations or most situations.

66.     The MCPM, NCCI Policy Manual, NCCI Edits, and CPT Assistant are all incorporated by reference into the New Jersey no-fault insurance regulations. See N.J.A.C. 11:3–29.4.

67.     With respect to unbundling, N.J.A.C. 11:3–29.4 provides that:

Artificially separating or partitioning what is inherently one total Procedure into subparts that are integral to the whole for the purpose of increasing medical fees is prohibited.

68.     Chapter 1 of the NCCI Policy manual provides that:

Procedures should be reported with the most comprehensive CPT code that describes the services performed. Physicians must not unbundle the services described by a HCPCS/CPT code.

69.     Chapter 12 of the MCPM provides that:

The narrative for many CPT codes includes a parenthetical statement that the Procedure represents a 'separate Procedure.' The inclusion of this statement indicates that the Procedure, while possible to perform separately, is generally included in a more comprehensive Procedure, and the service is not to be billed when a related, more comprehensive, service is performed.

## G.     The New Jersey Insurance Fraud Prevention Act

70.     New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. 17:33A–1 et seq. A healthcare services provider violates the Insurance Fraud Prevention Act if, among other things, it:

Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

Conceals or knowing fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

See N.J.S.A. 17:33A–4.

71.     A healthcare services provider also violates the Insurance Fraud Prevention Act if it either: (i) "knowingly assists, conspires with or urges any person or practitioner to violate any of provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act." Id.

72.     Violators of the IFPA are liable to the insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A 17:33A–7(a).

73.     A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. See N.J.S.A. 17:33A–7(b).

74.     The IFPA defines a pattern as five or more "related violations". See N.J.S.A. 17:33A–3. Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating the IFPA. See N.J.S.A.17:33A–3.

**II.     The Defendants' Fraudulent Scheme**

75.     Beginning in 2013, and continuing through the present day, the Defendants masterminded and implemented a massive fraudulent scheme in which they submitted thousands of bills to GEICO for medically unnecessary, illusory, and otherwise non-reimbursable services.

**A.     The Defendants' Unlawful Referral Schemes**

**1.     The Unlawful Referrals from Totowa Pain to Cliffside MRI**

76.     As set forth above, chiropractors are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

77.     Even so, Totowa Pain and Fontanella received illegal compensation in exchange for patient referrals to Cliffside MRI.

78.     For example, and as set forth above, the payment of kickbacks in exchange for patient referrals to Cliffside MRI was the regular way in which the Davits operated Cliffside MRI.

79.     In fact, one chiropractor who referred patients to Cliffside MRI, namely Dimeo, already pleaded guilty to various insurance fraud-related crimes and – in his plea allocution and in a subsequent, April 28, 2018 affidavit – swore that he received tens of thousands of dollars in

kickbacks from Samuel Davit and Michael Davit in exchange for patient referrals to Cliffside MRI over the course of at least three years.

80.     During this same period when the Davits and Cliffside MRI were paying massive sums in exchange for patient referrals to Cliffside MRI, Totowa Pain and Fontanella referred a large number of GEICO Insureds to Cliffside MRI for MRIs, despite the fact that the Insureds did not legitimately require any MRIs from Cliffside MRI.

81.     In exchange for compensation from the Davits, Totowa Pain and Fontanella routinely referred patients, or caused patients to be referred, to Cliffside MRI for MRI services, regardless of the Insureds' individual symptoms or presentation.

82.     Because Totowa Pain and Fontanella received illegal compensation in exchange for patient referrals, they never were eligible to collect PIP Benefits from GEICO and other insurers.

83.     Even so, in each of the claims identified in Exhibit "1", Totowa Pain and Fontanella falsely represented that Totowa Pain was in compliance with all significant laws and regulations governing healthcare practice in New Jersey, and therefore were eligible to collect PIP Benefits, when in fact they were not.

84.     What is more, in each of the claims identified in Exhibit "1", Totowa Pain and Fontanella fraudulently concealed the fact that they received compensation in exchange for patient referrals, thereby rendering Totowa Pain ineligible for PIP reimbursement.

85.     In the claims identified in Exhibit "1", nearly all of the Insureds whom the Defendants purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

86.     Most of the Insureds in the claims identified in Exhibits "1" did not require radiology services such as MRIs as the result of the minor accidents they experienced or purported to experience.

87.     Even so – and in keeping with the fact that the MRI referrals from Totowa Pain and Fontanella were in exchange for compensation from Cliffside MRI and the Davits – Totowa Pain and Fontanella routinely referred GEICO Insureds to Cliffside MRI for MRIs, regardless of the Insureds' need for, or in many cases the total absence of any need for, such MRIs.

88.     For example:

(i)     On May 11, 2013, an Insured named YG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that YG's vehicle was drivable following the accident. The police report further indicated that YG was not injured and did not complain of any pain at the scene. In keeping with the fact that YG was not seriously injured, YG did not visit any hospital emergency room following the accident. To the extent that YG experienced any health problems at all as the result of the accident, they were of low or minimal severity, and YG did not require any MRIs as a result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, on or about July 1, 2013, Totowa Pain and Fontanella caused YG to be referred to Cliffside MRI for two unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits.

(ii)    On August 17, 2014, an Insured named FO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that FO's vehicle was drivable following the accident. The police report further indicated that FO was not injured and did not complain of any pain at the scene. In keeping with the fact that FO was not seriously injured, FO did not visit any hospital emergency room following the accident. To the extent that FO experienced any health problems at all as the result of the accident, they were of low or minimal severity, and FO did not require any MRIs as the result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, on or about October 19, 2014, Totowa Pain and Fontanella caused FO to be referred to Cliffside MRI for two unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits.

(iii)   On March 3, 2015, an Insured named SB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that SB's vehicle was drivable following the accident. The police report further indicated that SB was not injured and did not complain of any

pain at the scene. In keeping with the fact that SB was not seriously injured, SB did not visit any hospital emergency room following the accident. To the extent that SB experienced any health problems at all as the result of the accident, they were of low or minimal severity, and SB did not require any MRIs as a result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, on or about April 13, 2015, Totowa Pain and Fontanella caused SB to be referred to Cliffside MRI for three unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits.

(iv)    On June 29, 2015, an Insured named GM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that GM's vehicle was towed following the accident. The police report further indicated that GM was not injured and did not complain of any pain at the scene. In keeping with the fact that GM was not seriously injured, GM did not visit any hospital emergency room following the accident. To the extent that GM experienced any health problems at all as the result of the accident, they were of low or minimal severity, and GM did not require any MRIs as a result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, on or about August 26, 2015, Totowa Pain and Fontanella caused GM to be referred to Cliffside MRI for two unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits.

(v)     On June 30, 2015, an Insured named GD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that GD's vehicle was drivable following the accident. The police report further indicated that although GD complained of shoulder pain, GD refused medical attention at the scene. In keeping with the fact that GD was not seriously injured, GD did not visit any hospital emergency room following the accident. To the extent that GD experienced any health problems at all as the result of the accident, they were of low or minimal severity, and GD did not require any MRIs as a result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, on or about September 20, 2015, Totowa Pain and Fontanella caused GD to be referred to Cliffside MRI for two unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits.

(vi)    On January 19, 2016, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health problems at all as the result of the accident, they were of low or minimal severity, and LP did not require any MRIs as the result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, on or about March 16, 2016, Totowa Pain and Fontanella caused LP to be referred to

Cliffside MRI for two unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits.

(vii)    On January 19, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of low or minimal severity, and AS did not require any MRIs as a result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, on or about March 8, 2017, Totowa Pain and Fontanella caused AS to be referred to Cliffside MRI for two unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits.

(viii)   On June 24, 2017, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as the result of the accident, they were of low or minimal severity, and MB did not require any MRIs as a result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, on or about August 3, 2017, Totowa Pain and Fontanella caused MB to be referred to Cliffside MRI for two unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits.

(ix)     On September 20, 2017, an Insured named TK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that TK's vehicle was drivable following the accident. The police report further indicated that TK was not injured and did not complain of any pain at the scene. In keeping with the fact that TK was not seriously injured, TK did not visit any hospital emergency room following the accident. To the extent that TK experienced any health problems at all as the result of the accident, they were of low or minimal severity, and TK did not require any MRIs as a result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, on or about November 22, 2017, Totowa Pain and Fontanella caused TK to be referred to Cliffside MRI for two unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits.

(x)      On October 6, 2017, an Insured named AU was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that AU's vehicle was drivable following the accident. The police report further indicated that AU was not injured and did not complain of any

pain at the scene. In keeping with the fact that AU was not seriously injured, AU did not visit any hospital emergency room following the accident. To the extent that AU experienced any health problems at all as the result of the accident, they were of low or minimal severity, and AU did not require any MRIs as a result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, on or about September 19, 2017, Totowa Pain and Fontanella caused AU to be referred to Cliffside MRI for two unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits.

(xi)     On April 30, 2018, an Insured named CE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that CE's vehicle was drivable following the accident. The police report further indicated that CE was not injured and did not complain of any pain at the scene. In keeping with the fact that CE was not seriously injured, CE did not visit any hospital emergency room following the accident. To the extent that CE experienced any health problems at all as the result of the accident, they were of low or minimal severity. CE did not require any MRIs as a result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, on or about June 15, 2018, Totowa Pain and Fontanella caused CE to be referred to Cliffside MRI for two unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits.

(xii)    On April 30, 2018, an Insured named NR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that NR's vehicle was drivable following the accident. The police report further indicated that NR was not injured and did not complain of any pain at the scene. In keeping with the fact that NR was not seriously injured, NR did not visit any hospital emergency room following the accident. To the extent that NR experienced any health problems at all as the result of the accident, they were of low or minimal severity. NR did not require any MRIs as a result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, on or about June 15, 2018, Totowa Pain and Fontanella caused NR to be referred to Cliffside MRI for two unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits

(xiii)   On May 23, 2018, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that MH was not injured and did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, pursuant to the Defendants' unlawful referral agreement, on or about August 5, 2018, Totowa Pain and Fontanella caused MH to be referred to Cliffside MRI for two unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits.

(xiv)   On July 9, 2018, an Insured named HA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that HA's vehicle was drivable following the accident. The police report further indicated that HA was not injured and did not complain of any pain at the scene. In keeping with the fact that HA was not seriously injured, HA did not visit any hospital emergency room following the accident. To the extent that HA experienced any health problems at all as the result of the accident, they were of low or minimal severity. HA did not require any MRIs as a result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, on or about September 16, 2018, Totowa Pain and Fontanella caused HA to be referred to Cliffside MRI for two unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits.

(xv)   On January 11, 2019, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not seriously injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of the accident, they were of low or minimal severity. JR did not require any MRIs as a result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, on or about March 24, 2019, Totowa Pain and Fontanella caused JR to be referred to Cliffside MRI for two unnecessary MRIs in exchange for compensation from Cliffside MRI and the Davits.

## 2.   The Unlawful Referrals Between Totowa Pain and Specialty Medical

89.   As set forth above, physicians and chiropractors that pay or receive compensation in exchange for patient referrals are not eligible to receive PIP Benefits.

90.   Even so, Totowa Pain and Fontanella provided referrals to Specialty Medical, Milazzo, and Giasullo in exchange for illegal compensation.

91.   In order to bill GEICO and other automobile insurers for electrodiagnostic testing, Specialty Medical, Milazzo, and Giasullo needed to obtain patient referrals from other healthcare providers.

92.     At the same time, Totowa Pain and Fontanella wanted to submit as much billing for chiropractic services as possible to GEICO and other insurers, without regard for whether the underlying chiropractic services were medically necessary.

93.     However, to the extent that the Insureds in the claims set forth in Exhibits "1" and "2" suffered any injuries at all in their automobile accidents, they virtually always were minor soft tissue injuries such as sprains or strains.

94.     Ordinary soft tissue injuries such as sprains or strains virtually always resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths require healthcare services providers to demonstrate why continued treatment is necessary beyond the four–week, eight–week, and 13–week marks.

95.     As a result, Totowa Pain and Fontanella knew that their ability to submit and obtain payment on large amounts of chiropractic billing to GEICO and other automobile insurers would be limited by the Care Paths, inasmuch as they would not be able to demonstrate that the Insureds required additional chiropractic services beyond the first four or eight weeks of treatment, much less the 13–week mark.

96.     Totowa Pain and Fontanella also knew that – pursuant to the Care Paths – it would be much easier for them to obtain payment on large amounts of no-fault insurance billing for medically unnecessary chiropractic services if a licensed physician or physicians were to: (i) generate reports and diagnoses that purported to reflect injuries more serious than ordinary strains and sprains; and/or (ii) recommend the continued provision of chiropractic services beyond the first four, eight, or 13 weeks of treatment.

97.     Accordingly, Totowa Pain and Fontanella entered into a secret agreement with Specialty Medical, Milazzo, and Giasullo, whereby Totowa Pain and Fontanella would refer

24

Insureds to Specialty Medical for expensive examinations and electrodiagnostic testing, regardless of the Insureds' need for, or – in many cases – the total absence of any need for, such examinations and electrodiagnostic testing.

98.     In exchange for the medically unnecessary referrals, Specialty Medical, Milazzo, and Giasullo provided unlawful compensation to Totowa Pain and Fontanella.

99.     The unlawful compensation was provided in the form of: (i) ostensibly legitimate payments to "lease" space at the offices of Totowa Pain and Fontanella, which actually were disguised compensation paid in exchange for patient referrals; and (ii) return referrals back from Specialty Medical, Milazzo, and Giasullo to Totowa Pain and Fontanella for continued chiropractic and physical therapy services.

100.    In reality, these were "pay–to–play" arrangements that caused Totowa Pain and Fontanella to provide access to Insureds and to refer Insureds to Specialty Medical for patient examination and electrodiagnostic testing services, regardless of the Insureds' need, or – in many cases – the total absence of need, for such examinations and services.

101.    In keeping with the fact that these ostensibly legitimate "rent" payments actually were disguised kickbacks in exchange for patient referrals, Specialty Medical operated from Totowa Pain and Fontanella's office on only a "sporadic" basis. See N.J.A.C. 13:35-6.17(h).

102.    For example, Specialty Medical did not maintain regular office hours at Totowa Pain and Fontanella's office. Rather, it appeared at Totowa Pain and Fontanella' offices on different days each month, only when Totowa Pain and Fontanella had patients to refer to Specialty Medical pursuant to the unlawful referral scheme.

103.    In further keeping with the fact that the putative "rent" payments were not for fixed fees set in advance, and did not cover any regular lease terms, Totowa Pain and Fontanella's office

did not contain any external signage or other indicia of Specialty Medical, Milazzo, and Giasullo's ongoing presence at the offices.

104.     In addition, the Defendants' false contentions that Insureds continued to suffer from high levels of pain as the result of their relatively minor automobile accidents, false diagnoses of Insureds, and the subsequent return referrals by Specialty Medical, Milazzo, and Giasullo to Totowa Pain and Fontanella for continued medically unnecessary chiropractic services, constituted unlawful compensation to Totowa Pain and Fontanella for their initial referrals of Insureds to Specialty Medical.

105.     In keeping with the fact that Specialty Medical, Milazzo, and Giasullo's return referrals to Totowa Pain and Fontanella were not predicated on medical necessity, and in fact constituted unlawful compensation to Totowa Pain and Fontanella for their initial referrals of Insureds to Specialty Medical, the Defendants' own records indicated that Totowa Pain and Fontanella's prior chiropractic treatment had not been effective in resolving the Insureds' supposed complaints.

106.     For example:

(i)     On May 11, 2013, an Insured named YG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that YG's vehicle was drivable following the accident. The police report further indicated that YG was not injured and did not complain of any pain at the scene. In keeping with the fact that YG was not seriously injured, YG did not visit any hospital emergency room following the accident. To the extent that YG experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, YG thereafter sought treatment from Fontanella, Hayek, Cruz, and Totowa Pain, where YG purportedly received chiropractic and acupuncture treatments between May 2013 and July 2013. In or about July 2013, Totowa Pain, Fontanella, and Hayek caused YG to be referred to Specialty Medical pursuant to the Defendants' unlawful referral agreement. Thereafter, on July 25, 2013, Milazzo purported to examine YG on behalf of Specialty Medical, and falsely reported that YG continued to suffer from high levels of pain. Though the chiropractic and acupuncture treatments that Totowa Pain, Fontanella, and Hayek purportedly had provided supposedly had been ineffective

in resolving YG's putative symptoms, Milazzo nonetheless referred YG back to Totowa Pain for continued chiropractic and acupuncture treatments at the conclusion of the July 25, 2013 examination. However, Fontanella, Hayek, Cruz, and Totowa Pain did not take any action based on Milazzo's purported diagnosis. To the contrary, Fontanella, Hayek, Cruz, and Totowa Pain purported to provide substantially similar chiropractic and acupuncture services to YG as they had before they referred YG to Specialty Medical. Later, Milazzo and Specialty Medical provided another examination of YG on August 15, 2013, and again referred YG back to Totowa Pain for continued chiropractic and acupuncture treatments, despite the fact that – by that point – YG had received over three months of chiropractic and acupuncture services that supposedly had been ineffective in resolving YG's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Totowa Pain to Specialty Medical.

(ii)     On August 17, 2014, an Insured named FO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that FO's vehicle was drivable following the accident. The police report further indicated that FO was not injured and did not complain of any pain at the scene. In keeping with the fact that FO was not seriously injured, FO did not visit any hospital emergency room following the accident. To the extent that FO experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, FO thereafter sought treatment from Fontanella, Hayek, Cruz, and Totowa Pain, where FO purportedly received chiropractic treatments between September 2014 and November 2014. In or about November 2014, Totowa Pain, Fontanella, and Hayek caused FO to be referred to Specialty Medical pursuant to the Defendants' unlawful referral agreement. Thereafter, on November 20, 2014, Milazzo purported to examine FO on behalf of Specialty Medical, and falsely reported that FO continued to suffer from high levels of pain. Though the chiropractic and acupuncture treatments that Totowa Pain, Fontanella, and Hayek purportedly had provided supposedly had been ineffective in resolving FO's putative symptoms, Milazzo nonetheless referred FO back to Totowa Pain for continued chiropractic treatments at the conclusion of the November 20, 2014 examination. However, Totowa Pain, Fontanella, and Hayek did not take any action based on Milazzo's purported diagnosis. To the contrary, Totowa Pain, Fontanella, and Hayek purported to provide substantially similar chiropractic services to FO as they had before they referred FO to Specialty Medical. This medically unnecessary return referral was unlawful compensation for the initial, medically unnecessary referral from Totowa Pain to Specialty Medical.

(iii)    On March 3, 2015, an Insured named SB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that SB's vehicle was drivable following the accident. The police report further indicated that SB was not injured and did not complain of any pain at the scene. In keeping with the fact that SB was not seriously injured, SB did

not visit any hospital emergency room following the accident. To the extent that SB experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, SB thereafter sought treatment from Fontanella, Hayek, Cruz, and Totowa Pain, where SB purportedly received chiropractic treatments between March 2015 and May 2015. In or about May 2015, Totowa Pain, Fontanella, and Hayek caused SB to be referred to Specialty Medical pursuant to the Defendants' unlawful referral agreement. Thereafter, on May 25, 2015, Milazzo purported to examine SB on behalf of Specialty Medical, and falsely reported that SB continued to suffer from high levels of pain. Though the chiropractic treatments that Totowa Pain, Fontanella, and Hayek purportedly had provided supposedly had been ineffective in resolving SB's putative symptoms, Milazzo nonetheless referred SB back to Totowa Pain for continued chiropractic treatments at the conclusion of the May 25, 2015 examination. However, Totowa Pain, Fontanella, and Hayek did not take any action based on Milazzo's purported diagnosis. To the contrary, Fontanella, Hayek, Cruz, and Totowa Pain purported to provide substantially similar chiropractic services to SB as they had before they referred SB to Specialty Medical. Later, Milazzo and Specialty Medical provided another examination of SB on June 25, 2015, and again referred SB back to Totowa Pain for continued chiropractic treatments, despite the fact that – by that point – SB had received over three months of chiropractic and acupuncture services that supposedly had been ineffective in resolving SB's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Totowa Pain to Specialty Medical.

(iv)     On June 29, 2015, an Insured named GM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that GM's vehicle was towed following the accident. The police report further indicated that GM was not injured and did not complain of any pain at the scene. In keeping with the fact that GM was not seriously injured, GM did not visit any hospital emergency room following the accident. To the extent that GM experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, GM thereafter sought treatment from Fontanella, Hayek, Cruz, and Totowa Pain, where GM purportedly received chiropractic treatments between July 2015 and September 2015. In or about September 2015, Totowa Pain, Fontanella, and Hayek caused GM to be referred to Specialty Medical pursuant to the Defendants' unlawful referral agreement. Thereafter, on September 3, 2015, Milazzo purported to examine GM on behalf of Specialty Medical, and falsely reported that GM continued to suffer from high levels of pain. Though the chiropractic and acupuncture treatments that Totowa Pain, Fontanella, and Hayek purportedly had provided supposedly had been ineffective in resolving GM's putative symptoms, Milazzo nonetheless referred GM back to Totowa Pain for continued chiropractic treatments at the conclusion of the September 3, 2015 examination. However, Totowa Pain, Fontanella, and Hayek did not take any action based on Milazzo's purported diagnosis. To the contrary, Totowa Pain, Fontanella, and Hayek purported to provide substantially similar chiropractic services to GM as they had before they referred GM to Specialty

28

Medical. Later, Milazzo and Specialty Medical provided another examination of GM on January 21, 2016, and again referred GM back to Totowa Pain for continued chiropractic treatments, despite the fact that – by that point – GM had received over six months of chiropractic and acupuncture services that supposedly had been ineffective in resolving GM's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Totowa Pain to Specialty Medical.

(v)    On June 30, 2015, an Insured named GD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that GD's vehicle was drivable following the accident. The police report further indicated that although GD complained of shoulder pain, GD refused medical attention at the scene. In keeping with the fact that GD was not seriously injured, GD did not visit any hospital emergency room following the accident. To the extent that GD experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, GD thereafter sought treatment from Fontanella, Hayek, Cruz, and Totowa Pain, where GD purportedly received chiropractic and acupuncture treatments between July 2015 and October 2015. In or about October 2015, Totowa Pain, Fontanella, and Hayek caused GD to be referred to Specialty Medical pursuant to the Defendants' unlawful referral agreement. Thereafter, on October 22, 2015, Milazzo purported to examine GD on behalf of Specialty Medical, and falsely reported that GD continued to suffer from high levels of pain. Though the chiropractic and acupuncture treatments that Fontanella, Hayek, Cruz, and Totowa Pain purportedly had provided supposedly had been ineffective in resolving GD's putative symptoms, Milazzo nonetheless referred GD back to Totowa Pain for continued chiropractic and acupuncture treatments at the conclusion of the October 22, 2015 examination. However, Fontanella, Hayek, Cruz, and Totowa Pain did not take any action based on Milazzo's purported diagnosis. To the contrary, Fontanella, Hayek, Cruz, and Totowa Pain purported to provide substantially similar chiropractic and acupuncture services to GD as they had before they referred GD to Specialty Medical. This medically unnecessary return referral was unlawful compensation for the initial, medically unnecessary referral from Totowa Pain to Specialty Medical.

(vi)    On January 19, 2016, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. Even so, LP thereafter sought treatment from Totowa Pain, Fontanella, and Hayek, where LP purportedly received chiropractic treatments between January 2016 and March 2016. In or about March 2016, Totowa Pain, Fontanella, and Hayek caused LP to be referred to Specialty Medical pursuant

to the Defendants' unlawful referral agreement. Thereafter, on March 31, 2016, Milazzo purported to examine LP on behalf of Specialty Medical, and falsely reported that LP continued to suffer from high levels of pain. Though the chiropractic and physical therapy treatments that Totowa Pain, Fontanella, and Hayek purportedly had provided supposedly had been ineffective in resolving LP's putative symptoms, Milazzo nonetheless referred LP back to Totowa Pain for continued chiropractic treatments at the conclusion of the March 31, 2016 examination. However, Totowa Pain, Fontanella, and Hayek did not take any action based on Milazzo's purported diagnosis. To the contrary, Totowa Pain, Fontanella, and Hayek purported to provide substantially similar chiropractic services to LP as they had before they referred LP to Specialty Medical. Later, Specialty Medical, Milazzo, and Giasullo provided another examination of LP on June 2, 2016, and again referred LP back to Totowa Pain for continued chiropractic treatments, despite the fact that – by that point – LP had received over four months of chiropractic services that supposedly had been ineffective in resolving LP's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Totowa Pain to Specialty Medical.

(vii)    On October 17, 2016, an Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that ER's vehicle was drivable following the accident. The police report further indicated that ER was not injured and did not complain of any pain at the scene. Later that day, ER travelled on his own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that ER was briefly observed on an outpatient basis, and was discharged that same day with a low back pain and muscle spasm diagnosis. To the extent that ER experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, ER thereafter sought treatment from Totowa Pain, Fontanella, and Hayek, where ER purportedly received chiropractic  and acupuncture treatments between October 2016 and December 2016. In or about December 2016, Totowa Pain, Fontanella, and Hayek caused ER to be referred to Specialty Medical pursuant to the Defendants' unlawful referral agreement. Thereafter, on December 15, 2016, Milazzo purported to examine ER on behalf of Specialty Medical, and falsely reported that ER continued to suffer from high levels of pain. Though the chiropractic and acupuncture treatments that Totowa Pain, Fontanella, and Hayek purportedly had provided supposedly had been ineffective in resolving ER's putative symptoms, Milazzo nonetheless referred ER back to Totowa Pain for continued chiropractic treatments at the conclusion of the December 15, 2016 examination. However, Totowa Pain, Fontanella, and Hayek did not take any action based on Milazzo's purported diagnosis. To the contrary, Totowa Pain, Fontanella, and Hayek purported to provide substantially similar chiropractic services to ER as they had before they referred ER to Specialty Medical. Later, Specialty Medical, Milazzo, and Giasullo provided another examination of ER on January 19, 2017, and again referred ER back to Totowa Pain for continued chiropractic and acupuncture treatments, despite the fact that – by that point – ER had received over

four months of chiropractic and acupuncture services that supposedly had been ineffective in resolving ER's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Totowa Pain to Specialty Medical.

(viii)   On November 18, 2016, an Insured named AT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that AT's vehicle was drivable following the accident. The police report further indicated that AT was not injured and did not complain of any pain at the scene. The next day, AT travelled on her own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that AT was briefly observed on an outpatient basis, and was discharged that same day with a back pain diagnosis. To the extent that AT experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, AT thereafter sought treatment from Totowa Pain, Fontanella, and Hayek, where AT purportedly received chiropractic treatments between November 2016 and February 2017. In or about February 2017, Totowa Pain, Fontanella, and Hayek caused AT to be referred to Specialty Medical pursuant to the Defendants' unlawful referral agreement. Thereafter, on February 2, 2017, Milazzo purported to examine AT on behalf of Specialty Medical, and falsely reported that AT continued to suffer from high levels of pain. Though the chiropractic treatments that Totowa Pain, Fontanella, and Hayek purportedly had provided supposedly had been ineffective in resolving AT's putative symptoms, Milazzo nonetheless referred AT back to Totowa Pain for continued chiropractic treatments at the conclusion of the February 2, 2017 examination. However, Totowa Pain, Fontanella, and Hayek did not take any action based on Milazzo's purported diagnosis. To the contrary, Totowa Pain, Fontanella, and Hayek purported to provide substantially similar chiropractic services to AT as they had before they referred AT to Specialty Medical. This medically unnecessary return referral was unlawful compensation for the initial, medically unnecessary referral from Totowa Pain to Specialty Medical.

(ix)   On April 17, 2017, an Insured named VP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that VP's vehicle was drivable following the accident. The police report further indicated that VP was not injured and did not complain of any pain at the scene. The next day, VP travelled on her own to Hackensack University Medical Center. The contemporaneous hospital records indicated that VP was briefly observed on an outpatient basis, and was discharged that same day with a minor muscle pain diagnosis. To the extent that VP experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, VP thereafter sought treatment from Fontanella, Hayek, Cruz, and Totowa Pain, where VP purportedly received chiropractic and acupuncture treatments between April 2017 and July 2017. In or about July 2017, Totowa Pain, Fontanella, and Hayek caused VP to be referred to Specialty Medical pursuant to the Defendants' unlawful referral agreement. Thereafter, on July 6, 2017, Milazzo

purported to examine VP on behalf of Specialty Medical, and falsely reported that VP continued to suffer from high levels of pain. Though the chiropractic and acupuncture treatments that Fontanella, Hayek, Cruz, and Totowa Pain purportedly had provided supposedly had been ineffective in resolving VP's putative symptoms, Milazzo nonetheless referred VP back to Totowa Pain for continued chiropractic and acupuncture treatments at the conclusion of the July 6, 2017 examination. However, Totowa Pain, Fontanella, and Hayek did not take any action based on Milazzo's purported diagnosis. To the contrary, Fontanella, Hayek, Cruz, and Totowa Pain purported to provide substantially similar chiropractic and acupuncture services to VP as they had before they referred VP to Specialty Medical. Later, Specialty Medical, Milazzo, and Giasullo provided another examination of VP on September 7, 2017, and again referred VP back to Totowa Pain for continued chiropractic and acupuncture treatments, despite the fact that – by that point – VP had received over four months of chiropractic and acupuncture services that supposedly had been ineffective in resolving VP's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Totowa Pain to Specialty Medical.

(x)     On June 24, 2017, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, MB thereafter sought treatment from Fontanella, Hayek, Cruz, and Totowa Pain, where MB purportedly received chiropractic and acupuncture treatments between June 2017 and August 2017. In or about August 2017, Totowa Pain, Fontanella, and Hayek caused MB to be referred to Specialty Medical pursuant to the Defendants' unlawful referral agreement. Thereafter, on August 17, 2017, Milazzo purported to examine MB on behalf of Specialty Medical, and falsely reported that MB continued to suffer from high levels of pain. Though the chiropractic and acupuncture treatments that Totowa Pain, Fontanella, and Hayek purportedly had provided supposedly had been ineffective in resolving MB's putative symptoms, Milazzo nonetheless referred MB back to Totowa Pain for continued chiropractic treatments at the conclusion of the August 17, 2017 examination. However, Fontanella, Hayek, Cruz, and Totowa Pain did not take any action based on Milazzo's purported diagnosis. To the contrary, Fontanella, Hayek, Cruz, and Totowa Pain purported to provide substantially similar chiropractic and acupuncture services to MB as they had before they referred MB to Specialty Medical. Later, Milazzo and Specialty Medical provided another examination of MB on September 21, 2017, and again referred MB back to Totowa Pain for continued chiropractic and acupuncture treatments, despite the fact that – by that point – MB had received over three months of chiropractic and acupuncture services that supposedly had been ineffective in resolving MB's putative symptoms. These medically unnecessary return referrals were unlawful

compensation for the initial, medically unnecessary referral from Totowa Pain to Specialty Medical.

107.   As set forth above,  N.J.A.C. 13:35-6.17(h) and N.J.A.C. 13:44E-3.9 specifically prohibit a chiropractor from referring patients to a physician practicing at the same premises as the chiropractor for diagnostic testing, unless the physician actually is the chiropractor's bona fide partner, fellow shareholder in a professional entity, or regularly salaried employee.

108.   No legitimate chiropractor would make referrals in violation of the law.

109.   Even so, all of Totowa Pain and Fontanella's referrals to Specialty Medical for electrodiagnostic testing were made in violation of N.J.A.C. 13:35-6.17(h) and N.J.A.C. 13:44E-3.9, because Specialty Medical, Milazzo, and Giasullo conducted the electrodiagnostic testing at Totowa Pain's office despite the fact that Specialty Medical, Milazzo, and Giasullo were not Fontanella's bona fide partners, fellow shareholders in Totowa Pain, or regularly salaried employees.

110.   In keeping with the fact that Totowa Pain and Fontanella unlawfully referred Insureds to Specialty Medical, Milazzo, and Giasullo for electrodiagnostic testing in violation of N.J.A.C. 13:35-6.17(h) and N.J.A.C. 13:44E-3.9, Specialty Medical, Milazzo, and Giasullo's bills for the resulting electrodiagnostic testing services routinely identified Fontanella as the source of their referrals for the electrodiagnostic testing.

111.   For example, although Specialty Medical, Milazzo, and Giasullo were not bona fide partners of Fontanella, fellow shareholders in Totowa Pain, or regularly salaried employees of Totowa Pain, Specialty Medical, Milazzo, and Giasullo purported to provide electrodiagnostic testing to the following Insureds at Totowa Pain on the following dates pursuant to referrals that violated N.J.A.C. 13:35-6.17(h) and N.J.A.C. 13:44E-3.9:

(i)      YG, on August 15, 2013;

(ii)     CC, on November 14, 2013;

(iii)    DG, on January 2, 2014;

(iv)    JB, on November 6, 2014;

(v)     DB on January 22, 2015;

(vi)    SB, on June 25, 2015;

(vii)   GM on October 22, 2015,

(viii)  SR on November 19, 2015;

(ix)    DG, on January 7, 2016;

(x)     MR, on February 4, 2016;

(xi)    LP, on May 5, 2016;

(xii)   JS, on September 1, 2016;

(xiii)  DP, on October 6, 2016;

(xiv)  CC, on November 3, 2016;

(xv)   LR, on January 5, 2017;

(xvi)  GM, on March 2, 2017;

(xvii)  KP, on May 4, 2017;

(xviii) JV, on August 17, 2017;

(xix)  MB, on September 7, 2017; and

(xx)   WA, on November 16, 2017.

112.    These are only representative examples. In the claims identified in Exhibits "1" and "2", Totowa Pain and Fontanella frequently referred the Insureds to Specialty Medical, Milazzo, and Giasullo for examinations and unlawful electrodiagnostic testing, regardless of the Insureds'

need, or – in many cases – the total absence of need, for the referrals, in exchange for unlawful compensation from Specialty Medical, Milazzo, and Giasullo.

113.   In all of the claims identified in Exhibits "1" and "2", Totowa Pain, Fontanella, Specialty Medical, Milazzo, and Giasullo falsely represented that they were in compliance with all significant laws governing healthcare practice in New Jersey, and therefore were eligible to collect PIP Benefits in the first instance.

114.   In fact, Fontanella, Totowa Pain, Specialty Medical, Milazzo, and Giasullo were not in compliance with all significant laws and regulations governing healthcare practice in New Jersey, and were not eligible to collect PIP Benefits in the first instance, inasmuch as they paid and/or received illegal compensation in exchange for patient referrals.

**3.     The Referrals in Violation of the Codey Law**

115.   Not only did the Defendants provide and/or receive illegal compensation in exchange for patient referrals, and not only did Totowa Pain and Fontanella routinely violate N.J.A.C. 13:44E-3.9 when they referred Insureds to Specialty Medical, Milazzo, and Giasullo for electrodiagnostic tests, but Specialty Medical and Milazzo routinely engaged in illegal self-referrals for electrodiagnostic testing in violation of the Codey Law.

116.   Milazzo – as a physician – was a "practitioner" as defined by the Codey Law. See N.J.S.A. 45:9-22.4.

117.   Specialty Medical – as a business purporting to provide healthcare services – was a "healthcare service" as defined by the Codey Law. See N.J.S.A. 45:9-22.4.

118.   Milazzo – as a purported owner of Specialty Medical – had a "significant beneficial interest" in Specialty Medical. See N.J.S.A. 45:9-22.4.

119.   As a result, Milazzo could not lawfully refer Insureds to Specialty Medical for

electrodiagnostic testing unless – among other things – the electrodiagnostic tests were provided at his own medical offices. See N.J.S.A. 45:9-22-5(c)(1).

120.    Even so, in the claims identified in Exhibit "2", Milazzo routinely and unlawfully referred Insureds to Specialty Medical for electrodiagnostic testing services that were not provided at his own medical offices.

121.    For example:

(i)    On or about May 28, 2015, Milazzo self-referred an Insured named SB to Specialty Medical for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on June 25, 2015 at Totowa Pain and Fontanella's offices, rather than at Milazzo or Specialty Medical's own medical offices.

(ii)    On or about September 3, 2015, Milazzo self-referred an Insured named GM to Specialty Medical for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on October 22, 2015 at Totowa Pain and Fontanella's offices, rather than at Milazzo or Specialty Medical's own medical offices.

(iii)    On or about December 3, 2015, Milazzo self-referred an Insured named DG to Specialty Medical for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on January 7, 2016 at Totowa Pain and Fontanella's offices, rather than at Milazzo or Specialty Medical's own medical offices.

(iv)    On or about March 31, 2016, Milazzo self-referred an Insured named LP to Specialty Medical for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on May 5, 2016 at Totowa Pain and Fontanella's offices, rather than at Milazzo or Specialty Medical's own medical offices.

(v)    On or about October 20, 2016, Milazzo self-referred an Insured named CC to Specialty Medical for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on November 3, 2016 at Totowa Pain and Fontanella's offices, rather than at Milazzo or Specialty Medical's own medical offices.

(vi)    On or about December 1, 2016, Milazzo self-referred an Insured named LL to Specialty Medical for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on January 5, 2017 at Totowa Pain and Fontanella's

offices, rather than at Milazzo or Specialty Medical's own medical offices.

(vii)    On or about December 15, 2016, Milazzo self-referred an Insured named ER to Specialty Medical for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on January 5, 2017 at Totowa Pain and Fontanella's offices, rather than at Milazzo or Specialty Medical's own medical offices.

(viii)    On or about April 6, 2017, Milazzo self-referred an Insured named KP to Specialty Medical for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on May 4, 2017 at Totowa Pain and Fontanella's offices, rather than at Milazzo or Specialty Medical's own medical offices.

(ix)    On or about August 3, 2017, Milazzo self-referred an Insured named DF to Specialty Medical for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on September 7, 2017 at Totowa Pain and Fontanella's offices, rather than at Milazzo or Specialty Medical's own medical offices.

(x)    On or about October 19, 2017, Milazzo self-referred an Insured named WA to Specialty Medical for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on November 16, 2017 at Totowa Pain and Fontanella's offices, rather than at Milazzo or Specialty Medical's own medical offices.

122.    These are only representative examples. In the claims identified in Exhibit "2", Milazzo routinely violated the Codey Law in that he self-referred Insureds to Specialty Medical for electrodiagnostic testing services that were not provided at his own medical offices.

**B.    The Defendants' Fraudulent Treatment and Billing Protocol**

123.    In the claims identified in Exhibits "1" and "2", the substantial majority of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender–bender" accidents, to the extent that they were involved in any actual accidents at all.

124.    In keeping with the fact that the substantial majority of the Insureds in the claims identified in Exhibits "1" and "2" were involved in relatively minor accidents, in most of the claims

identified in Exhibits "1" and "2", the Insureds did not seek treatment at any hospital as the result of their accidents.

125.    To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

126.    Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

127.    Concomitantly, almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems at all as a result of the relatively minor accidents they experienced or purported to experience.

128.    Even so, the Defendants purported to subject many Insureds to a medically unnecessary course of "treatment" that was provided pursuant to a pre–determined, fraudulent protocol designed to maximize the billing that the Defendants could submit or cause to be submitted to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

129.    The Defendants purported to provide their pre–determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any serious medical problems arising from any actual automobile accidents.

130.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent

step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent No-Fault billing for each Insured.

131.    No legitimate physician, chiropractor, medical practice, chiropractic practice, or other healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

132.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.     The Fraudulent Charges for Initial Examinations at Totowa Pain and Specialty Medical**

133.    As an initial step in their fraudulent scheme, Totowa Pain, Fontanella, Hayek, Specialty Medical, Milazzo, and Giasullo purported to provide virtually every Insured in the claims identified in Exhibits "1" and "2" with an initial examination.

134.    As set forth in Exhibit "1", Fontanella and Hayek purported to perform the majority of the initial examinations that were billed to GEICO through Totowa Pain.

135.    Totowa Pain, Fontanella, and Hayek then billed the majority of the initial examinations through Totowa Pain to GEICO under: (i) CPT code 99204, typically resulting in a charge of between $250.00 and $390.00 per examination; or (ii) CPT code 99205, typically resulting in a charge of between $350.00 and $390.00 per examination.

136.    As set forth in Exhibit "2", Milazzo purported to perform virtually all of the initial examinations that were billed to GEICO through Specialty Medical.

137.    Specialty Medical, Milazzo, and Giasullo then billed the initial examinations through Specialty Medical to GEICO under: (i) CPT code 99203, typically resulting in a charge of between $170.00 and $250.00 per examination; (ii) CPT code 99204, typically resulting in a

charge of $250.00 per examination; or (iii) CPT code 99244, typically resulting in a charge of $400.00 per examination.

138.   In the claims for initial examinations identified in Exhibits "1" and "2", the charges for the initial examinations were fraudulent in that they misrepresented Totowa Pain and Specialty Medical's eligibility to collect PIP Benefits in the first instance.

139.   In fact, Totowa Pain and Specialty Medical never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "1" and "2", because – as a result of the fraudulent scheme described herein – neither they nor the examinations were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

140.   The charges for the initial examinations also were fraudulent in that they misrepresented the extent, nature, and reimbursable amount for the initial examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

141.   Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT codes 99204, 99205, and 99244 to bill for an initial patient examination typically requires that the Insured present with problems of moderate to high severity.

142.   Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT codes 99204, 99205, and 99244 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

143.   Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination typically requires that the Insured present with problems of moderate severity.

144.   Thus, pursuant to the CPT Assistant, the moderately severe presenting problems

that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

145. By contrast, to the extent that the Insureds in the claims identified in Exhibits "1" and "2" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

146. Even so, in the claims for initial examinations identified in Exhibits "1" and "2", Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo routinely billed for their putative initial examinations using CPT codes 99203, 99204, 99205, and 99244, and thereby falsely represented that the Insureds presented with problems of moderate or moderate to high severity.

147. For example:

(i) On August 17, 2014, an Insured named FO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that FO's vehicle was drivable following the accident. The police report further indicated that FO was not injured and did not complain of any pain at the scene. In keeping with the fact that FO was not seriously injured, FO did not visit any hospital emergency room following the accident. To the extent that FO experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of FO on September 2, 2014, Totowa Pain and Fontanella billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii) On June 30, 2015, an Insured named GD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision, and that GD's vehicle was drivable following the accident. The police report further indicated that GD was not injured and did not complain of any pain at the scene. In keeping with the fact that GD was not seriously injured, GD did not visit any hospital emergency room following the accident. To the extent that GD experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of GD on October 22, 2015, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented

that the initial examination involved presenting problems of moderate to high severity.

(iii)    On January 19, 2016, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LP on January 28, 2016, Totowa Pain and Fontanella billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)    On March 1, 2016, an Insured named PF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that PF's vehicle was drivable following the accident. The police report further indicated that PF was not injured and did not complain of any pain at the scene. In keeping with the fact that PF was not seriously injured, PF did not visit any hospital emergency room following the accident. To the extent that PF experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of PF on April 26, 2016, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)    On June 5, 2016, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that JD's vehicle was drivable following the accident. The police report further indicated that JD was not injured and did not complain of any pain at the scene. In keeping with the fact that JD was not seriously injured, JD did not visit any hospital emergency room following the accident. To the extent that JD experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JD on June 23, 2016, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vi)    On October 17, 2016, an Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that ER's vehicle was drivable following the accident. The police report further indicated that ER was not injured and did not complain of any pain at the scene. Later that day, ER travelled on his own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that ER was briefly observed on an outpatient basis, and was discharged that same day with a

minor low back pain and muscle spasm diagnosis. To the extent that ER experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of ER on October 19, 2016, Totowa Pain and Fontanella billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)    On November 15, 2016, an Insured named RR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that RR's vehicle was drivable following the accident. The police report further indicated that RR was not injured and did not complain of any pain at the scene. .The next day, RR travelled on her own JFK Medical Center. The contemporaneous hospital records indicated that RR was briefly observed on an outpatient basis, and was discharged that same day with a back pain/strain diagnosis. To the extent that RR experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of RR on March 8, 2017, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)   On January 19, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AS on February 1, 2017, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)     On January 19, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AS on July 20, 2017, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)     On April 17, 2017, an Insured named VP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that VP's vehicle was drivable following the accident. The police report further indicated that VP was not injured and did not complain of any pain at the scene. The next day, VP travelled on her own to Hackensack University Medical Center. The contemporaneous hospital records indicated that VP was briefly observed on an outpatient basis, and was discharged that same day with a minor muscle pain diagnosis. To the extent that VP experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of VP on May 11, 2017, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xi)    On April 17, 2017, an Insured named VP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that VP's vehicle was drivable following the accident. The police report further indicated that VP was not injured and did not complain of any pain at the scene. The next day, VP travelled on her own to Hackensack University Medical Center. The contemporaneous hospital records indicated that VP was briefly observed on an outpatient basis, and was discharged that same day with a minor muscle pain diagnosis. To the extent that VP experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of VP on July 7, 2017, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xii)   On April 22, 2017, an Insured named MF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that MF's vehicle was drivable following the accident. The police report further indicated that MF was not injured and did not complain of any pain at the scene. In keeping with the fact that MF was not seriously injured, MF did not visit any hospital emergency room following the accident. To the extent that MF experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MF on May 10, 2017, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiii)  On June 2, 2017, an Insured named CP was involved in an automobile accident. The contemporaneous police report indicated that CP was not injured and did not complain of any pain at the scene. In keeping with the fact that CP was not seriously injured, CP did not visit any hospital emergency room following the accident. To the extent that CP experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported

initial examination of CP on November 29, 2017, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiv)   On June 24, 2017, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as the result of the accident, they were of low or minimal severity. To the extent that MB experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MB on June 28, 2017, Totowa Pain and Fontanella billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xv)   On September 20, 2017, an Insured named TK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that TK's vehicle was drivable following the accident. The police report further indicated that TK was not injured and did not complain of any pain at the scene. In keeping with the fact that TK was not seriously injured, TK did not visit any hospital emergency room following the accident. To the extent that TK experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of TK on October 11, 2017, Totowa Pain and Fontanella billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xvi)   On October 6, 2017, an Insured named AU was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that AU's vehicle was drivable following the accident. The police report further indicated that AU was not injured and did not complain of any pain at the scene. In keeping with the fact that AU was not seriously injured, AU did not visit any hospital emergency room following the accident. To the extent that AU experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AU on October 24, 2017, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xvii)   On October 6, 2017, an Insured named AU was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact,

rear-end collision, and that AU's vehicle was drivable following the accident. The police report further indicated that AU was not injured and did not complain of any pain at the scene. In keeping with the fact that AU was not seriously injured, AU did not visit any hospital emergency room following the accident. To the extent that AU experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AU on October 27, 2017, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xviii)   On November 28, 2017, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that RM's vehicle was drivable following the accident. The police report further indicated that RM was not injured and did not complain of any pain at the scene. Later that day, RM travelled on her own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that RM was briefly observed on an outpatient basis, and was discharged that same day with a cervical sprain diagnosis. To the extent that RM experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of RM on December 1, 2017, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xix)     On January 3, 2018, an Insured named AV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AV's vehicle was drivable following the accident. The police report further indicated that although AV complained of back pain, AV refused medical attention at the scene. Later that day, AV travelled on her own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that AV was briefly observed on an outpatient basis, and was discharged that same day with a cervical strain and low back pain diagnosis. To the extent that AV experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AV on January 17, 2018, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xx)      On March 26, 2018, an Insured named GC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that GC's vehicle was drivable following the accident. The police report further indicated that GC was not injured and did not complain of any pain at the scene. In keeping with the fact that GC was not seriously injured, GC did not visit any hospital emergency room following the accident. To the extent that GC experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of GC

on March 27, 2018, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxi)   On April 30, 2018, an Insured named CE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that CE's vehicle was drivable following the accident. The police report further indicated that CE was not injured and did not complain of any pain at the scene. In keeping with the fact that CE was not seriously injured, CE did not visit any hospital emergency room following the accident. To the extent that CE experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CE on May 7, 2018, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxii)  On April 30, 2018, an Insured named NR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that NR's vehicle was drivable following the accident. The police report further indicated that NR was not injured and did not complain of any pain at the scene. In keeping with the fact that NR was not seriously injured, NR did not visit any hospital emergency room following the accident. To the extent that NR experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of NR on May 7, 2018, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxiii) On May 23, 2018, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that MH was not injured and did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MH on May 30, 2018, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxiv)  On January 11, 2019, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not seriously injured, JR did not visit any hospital emergency room following the accident. To the extent that JR

experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JR on February 8, 2019, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

148.    These are only representative examples. In the claims for initial examinations identified in Exhibits "1" and "2", Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all.

149.    In the claims for initial examinations identified in Exhibits "1" and "2", Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for their charges for examinations under CPT codes 99203, 99204, 99205, and 99244, because examinations billable under CPT codes 99203, 99204, 99205, and 99244, are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

150.    In the claims for initial examinations identified in Exhibits "1" and "2" Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services the Defendants purported to provide to the Insureds.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

151.    Pursuant to the Fee Schedule, the use of CPT codes 99205 and 99244 to bill for an initial examination represents that the physician or chiropractor who performed the examination spent at least 60 minutes of face-to-face time with the patient or the patient's family.

152.    Pursuant to the Fee Schedule, the use of CPT code 99204 to bill for an initial examination represents that the physician or chiropractor who performed the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

153.    Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for an initial examination represents that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

154.    As set forth in Exhibit "1", Totowa Pain, Fontanella, and Hayek submitted virtually all of their billing for initial examinations under CPT codes 99205 and 99204, and thereby represented that the chiropractor who purported to perform the initial examinations spent between 45 to 60 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

155.    Moreover, as set forth in Exhibit "2", Specialty Medical, Milazzo, and Giasullo submitted many of their bills for initial examinations under CPT codes 99204, 99203, and 99244, and thereby represented that the physician or chiropractor who purported to perform the initial examinations spent between 30 to 60 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

156.    In fact, in the claims for initial examinations identified in Exhibits "1" and "2", neither Fontanella, Hayek, Milazzo, nor any other physician or chiropractor associated with Totowa Pain or Specialty Medical, ever spent more than 15 minutes – much less 60 minutes – of

face-to-face time with the Insureds or their families when conducting the examinations and consultations.

157.    Rather, in the claims for initial examinations identified in Exhibits "1" and "2", the initial examinations did not entail more than 15 minutes of face-to-face time between the examining physicians or chiropractors and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

158.    For instance, and in keeping with the fact that the initial examinations allegedly provided through Totowa Pain or Specialty Medical did not entail more than 15 minutes of face-to-face time with the Insureds or their families, Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo used template forms in purporting to conduct the initial examinations.

159.    The template forms that Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo used in purporting to conduct the initial examinations set forth a very limited range of examination parameters.

160.    The only face-to-face time between the examining physicians or chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

161.    These brief interviews and limited examinations did not require Fontanella, Hayek, Milazzo, or any other physicians or chiropractors associated with Totowa Pain or Specialty Medical, to spend more than 15 minutes of face-to-face time with the Insureds or their families.

162.    In the claims for initial examinations identified in Exhibits "1" and "2", Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo falsely represented that the examinations and consultations involved between 30 to 60 minutes of face-to-face time with the

Insureds or their families in order to create a false basis for their charges under CPT codes 99203, 99204, 99205, and 99244 because examinations billable under  CPT codes 99203, 99204, 99205, and 99244 are reimbursable at a higher rate than examinations that require less time to perform.

**c.      Misrepresentations Regarding "Comprehensive" Physical Examinations**

163.    Moreover, in the claims identified in Exhibits "1" and "2" for initial examinations under CPT codes 99204, 99205, and 99244, Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo falsely represented the extent of the underlying physical examinations.

164.    Pursuant to the CPT Assistant, the use of CPT codes 99204, 99205, and 99244 to bill for a patient examination represents that the physician or chiropractor who performed the examination conducted a "comprehensive" physical examination.

165.    As set forth in Exhibits "1" and "2", Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo billed many of their putative initial examinations using CPT codes 99204, 99205, and 99244, and thereby represented that Fontanella, Hayek, and Milazzo conducted comprehensive physical examinations of the Insureds who purportedly received the examinations.

166.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining chiropractor either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

167.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a general examination of multiple patient organ systems unless the physician or chiropractor has documented findings with respect to at least eight organ systems.

168.    Pursuant to the CPT Assistant, in the context of patient examinations, a chiropractor has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician or chiropractor has documented findings with respect to:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

169.    In the claims for initial examinations identified in Exhibits "1" and "2", when Fontanella, Hayek, Totowa Pain, Milazzo, Giasullo, Santangelo, and Specialty Medical billed for the initial examinations under CPT codes 99204, 99205, and 99244, they falsely represented that Fontanella and Hayek performed "comprehensive" patient examinations on the Insureds he purported to treat during the initial examinations.

170.    In fact, with respect to the claims for initial examinations under CPT codes 99204, 99205, and 99244 that are identified in Exhibits "1" and "2", neither Fontanella, Hayek, Milazzo, Giasullo, nor any other physician or chiropractor associated with Totowa Pain or Specialty Medical ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

171.    For instance, in each of the claims under CPT codes 99204, 99205, and 99244 identified in Exhibits "1" and "2", neither Fontanella, Hayek, and Milazzo nor any other physician or chiropractor associated with Totowa Pain and Specialty Medical ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

172.    Furthermore, although Fontanella, Hayek, and Milazzo often purported to provide an examination of the Insureds' musculoskeletal systems in the claims for initial examinations identified in Exhibits "1" and "2", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and/or

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

173.    For example:

(i)      On September 3, 2015, Specialty Medical, Milazzo, and Giasullo billed GEICO under CPT code 99244 for an initial examination that Milazzo purported to perform on an Insured named AM, and thereby represented that they had provided a "comprehensive" physical examination to AM. However, Milazzo did not document findings with respect to at least eight of AM's organ systems, nor did he document a "complete" examination of AM's musculoskeletal system or any of AM's other organ systems.

(ii)     On October 22, 2015, Specialty Medical, Milazzo, and Giasullo billed GEICO under CPT code 99244 for an initial examination that Milazzo purported to perform on an Insured named GD, and thereby represented that they had provided a "comprehensive" physical examination to GD. However, Milazzo did not document findings with respect to at least eight of GD's organ systems, nor did he document a "complete" examination of GD's musculoskeletal system or any of GD's other organ systems.

(iii)    On May 19, 2016, Fontanella, Totowa Pain billed GEICO under CPT code 99204 for an initial examination that Fontanella purported to perform on an Insured named DP, and thereby represented that they had provided a "comprehensive" physical examination to DP. However, Fontanella did not document findings with respect to at least eight of DP's organ systems, nor did he document a "complete" examination of DP's musculoskeletal system or any of DP's other organ systems.

(iv)     On August 8, 2016, Specialty Medical, Milazzo, and Giasullo billed GEICO under CPT code 99204 for an initial examination that Milazzo purported to perform on an Insured named DP, and thereby represented that they had provided a "comprehensive" physical examination to DP. However, Milazzo did not document findings with respect to at least eight of DP's organ systems, nor did he document a "complete" examination of DP's musculoskeletal system or any of DP's other organ systems.

(v)      On August 29, 2016,  Fontanella, Hayek, and Totowa Pain billed GEICO under CPT code 99204 for an initial examination that Hayek purported to perform on an Insured named EB, and thereby represented that they had provided a

"comprehensive" physical examination to EB. However, Hayek did not document findings with respect to at least eight of EB's organ systems, nor did he document a "complete" examination of EB's musculoskeletal system or any of EB's other organ systems

(vi)     On October 20, 2016, Specialty Medical, Milazzo, and Giasullo billed GEICO under CPT code 99204 for an initial examination that Milazzo purported to perform on an Insured named CC, and thereby represented that they had provided a "comprehensive" physical examination to CC. However, Milazzo did not document findings with respect to at least eight of CC's organ systems, nor did he document a "complete" examination of CC's musculoskeletal system or any of CC's other organ systems.

(vii)    On November 28, 2016, Totowa Pain, Fontanella, and Hayek billed GEICO under CPT code 99205 for an initial examination that Hayek purported to perform on an Insured named ATG, and thereby represented that they had provided a "comprehensive" physical examination to ATG. However, Hayek did not document findings with respect to at least eight of ATG's organ systems, nor did he document a "complete" examination of ATG's musculoskeletal system or any of ATG's other organ systems.

(viii)   On March 8, 2017, Specialty Medical, Milazzo, and Giasullo billed GEICO under CPT code 99244 for an initial examination that Milazzo purported to perform on an Insured named RR, and thereby represented that they had provided a "comprehensive" physical examination to RR. However, Milazzo did not document findings with respect to at least eight of RR's organ systems, nor did he document a "complete" examination of RR's musculoskeletal system or any of RR's other organ systems.

(ix)     On June 7, 2017, Totowa Pain, Fontanella, and Hayek billed GEICO under CPT code 99204 for an initial examination that Fontanella purported to perform on an Insured named DF, and thereby represented that they had provided a "comprehensive" physical examination to DF. However, Fontanella did not document findings with respect to at least eight of DF's organ systems, nor did he document a "complete" examination of DF's musculoskeletal system or any of DF's other organ systems.

(x)      On July 6, 2017, Specialty Medical, Milazzo, and Giasullo billed GEICO under CPT code 99204 for an initial examination that Milazzo purported to perform on an Insured named VP, and thereby represented that they had provided a "comprehensive" physical examination to VP. However, Milazzo did not document findings with respect to at least eight of VP's organ systems, nor did he document a "complete" examination of VP's musculoskeletal system or any of VP's other organ systems.

(xi)   On August 17, 2017, Specialty Medical, Milazzo, and Giasullo billed GEICO under CPT code 99204 for an initial examination that Milazzo purported to perform on an Insured named MB, and thereby represented that they had provided a "comprehensive" physical examination to MB. However, Milazzo did not document findings with respect to at least eight of MB's organ systems, nor did he document a "complete" examination of MB's musculoskeletal system or any of MB's other organ systems.

(xii)  On October 5, 2017, Specialty Medical, Milazzo, and Giasullo billed GEICO under CPT code 99204 for an initial examination that Milazzo purported to perform on an Insured named VM, and thereby represented that they had provided a "comprehensive" physical examination to VM. However, Milazzo did not document findings with respect to at least eight of VM's organ systems, nor did he document a "complete" examination of VM's musculoskeletal system or any of VM's other organ systems.

(xiii) On October 11, 2017, Fontanella, Hayek, and Totowa Pain billed GEICO under CPT code 99204 for an initial examination that Hayek purported to perform on an Insured TK, and thereby represented that they had provided a "comprehensive" physical examination to TK. However, Hayek did not document findings with respect to at least eight of TK's organ systems, nor did he document a "complete" examination of TK's musculoskeletal system or any of TK's other organ systems.

(xiv)  On October 19, 2017, Specialty Medical, Milazzo, and Giasullo billed GEICO under CPT code 99204 for an initial examination that Milazzo purported to perform on an Insured named WA, and thereby represented that they had provided a "comprehensive" physical examination to WA. However, Milazzo did not document findings with respect to at least eight of WA's organ systems, nor did he document a "complete" examination of WA's musculoskeletal system or any of WA's other organ systems.

(xv)   On October 19, 2017, Specialty Medical, Milazzo, and Giasullo billed GEICO under CPT code 99204 for an initial examination that Milazzo purported to perform on an Insured named AU, and thereby represented that they had provided a "comprehensive" physical examination to AU. However, Milazzo did not document findings with respect to at least eight of AU's organ systems, nor did he document a "complete" examination of AU's musculoskeletal system or any of AU's other organ systems.

(xvi)  On October 19, 2017, Specialty Medical, Milazzo, and Giasullo billed GEICO under CPT code 99204 for an initial examination that Milazzo purported to perform on an Insured named AU, and thereby represented that they had provided a "comprehensive" physical examination to AU. However, Milazzo did not document findings with respect to at least eight of AU's organ systems, nor did he

document a "complete" examination of AU's musculoskeletal system or any of AU's other organ systems.

(xvii)   On October 27, 2017, Totowa Pain, Fontanella, and Hayek billed GEICO under CPT code 99205 for an initial examination that Hayek purported to perform on an Insured named AU, and thereby represented that they had provided a "comprehensive" physical examination to AU. However, Hayek did not document findings with respect to at least eight of AU's organ systems, nor did he document a "complete" examination of AU's musculoskeletal system or any of AU's other organ systems.

(xviii)   On January 7, 2018, Totowa Pain, Fontanella, and Hayek billed GEICO under CPT code 99204 for an initial examination that Hayek purported to perform on an Insured named AV, and thereby represented that they had provided a "comprehensive" physical examination to AV. However, Hayek did not document findings with respect to at least eight of AV's organ systems, nor did he document a "complete" examination of AV's musculoskeletal system or any of AV's other organ systems.

(xix)   On March 27, 2018, Totowa Pain, Fontanella, and Hayek billed GEICO under CPT code 99204 for an initial examination that Hayek purported to perform on an Insured named GC, and thereby represented that they had provided a "comprehensive" physical examination to GC. However, Hayek did not document findings with respect to at least eight of GC's organ systems, nor did he document a "complete" examination of GC's musculoskeletal system or any of GC's other organ systems.

(xx)   On February 8, 2019, Totowa Pain, Fontanella, and Hayek billed GEICO under CPT code 99204 for an initial examination that Hayek purported to perform on an Insured named GM, and thereby represented that they had provided a "comprehensive" physical examination to GM. However, Hayek did not document findings with respect to at least eight of GM's organ systems, nor did he document a "complete" examination of GM's musculoskeletal system or any of GM's other organ systems.

174.   These are only representative examples. In all of the claims for initial examinations under CPT codes 99204, 99205, and 99244 that are identified in Exhibits "1" and "2", Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo falsely represented that they had provided "comprehensive" physical examinations, when in fact they had not.

175.   In all of the claims for initial examinations under CPT codes 99204, 99205, and 99244  that are identified in Exhibits "1" and "2", Fontanella, Hayek, Totowa Pain, Specialty

Medical, Milazzo, and Giasullo falsely represented that they had provided "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99204, 99205, and 99244, respectively, because examinations billable under CPT codes 99204, 99205, and 99244 are reimbursable at higher rates than examinations that do not require the examining physician or chiropractor to provide "detailed" or "comprehensive" physical examinations.

### d.    Misrepresentations Regarding the Extent of Medical Decision-Making

176.    Furthermore, pursuant to the Fee Schedule, the use of CPT code 99205 to bill for a patient examination represents that the physician or chiropractor who performed the examination engaged in "high complexity" medical decision-making.

177.    Similarly, pursuant to the Fee Schedule, the use of CPT codes 99204 or 99244 to bill for a patient examination represents that the physician or chiropractor who performed the examination engaged in "moderate complexity" medical decision-making.

178.    Moreover, pursuant to the Fee Schedule, the use of CPT code 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination engaged in "low complexity" medical decision-making.

179.    Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

180.    Pursuant to the CPT Assistant, the highly or moderately severe presenting problems that could require highly or moderately complex medical decision-making, and therefore support the use of CPT codes 99244, 99205, 99204, and 99203 to bill for an initial examination, typically are problems that pose a threat to the patient's life or a serious threat to their health.

181.    By contrast, to the extent that the Insureds in the claims identified in Exhibits "1" and "2", had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were minor soft tissue injuries such as sprains and strains.

182.    The diagnosis and treatment of these Insureds' minor soft tissue injuries did not require any complex medical decision-making at all, let alone any highly complex medical decision-making.

183.    What is more, strains and sprains virtually always resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate why continued treatment is necessary beyond the four-week, eight-week, and 13-week marks.

184.    By the time the Insureds in the claims identified in Exhibits "1" and "2" presented to Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo for the putative initial examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

185.    Though Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo routinely billed for their putative examinations using CPT codes 99244, 99205, 99204, and 99203, and thereby falsely represented that the examinations involved some legitimate, complex medical decision-making, in fact the examinations did not involve any legitimate medical decision-making at all.

186.    The putative initial examinations identified in Exhibits "1" and "2" did not involve any actual medical decision-making at all because the outcomes of the putative initial examinations were pre-determined to result in substantially similar, phony "diagnoses" for virtually every Insured, and a substantially similar, medically unnecessary treatment plan for every Insured.

187.    First, in the claims for initial examinations identified in Exhibits "1" and "2", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

188.    When the Insureds in the claims identified in Exhibits "1" and "2" presented to Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo for "treatment", they typically did not arrive with any medical records except, at times, basic radiology reports.

189.    Furthermore, prior to the initial examinations, Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo typically neither requested any medical records from any other healthcare providers, nor conducted any diagnostic tests.

190.    Second, in Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo's claims for initial examinations identified in Exhibits "1" and "2", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

191.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo, to the extent that Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo provided any such diagnostic procedures or treatment options in the first instance.

192.    In almost every instance, any diagnostic procedures and "treatments" that Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo actually typically provided were limited to a series of medically unnecessary follow-up examinations, electrodiagnostic testing, and chiropractic, physical therapy, and acupuncture treatments, none of which was health- or life-threatening if properly administered.

193.    Third, in Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo's claims for initial examinations identified in Exhibits "1" and "2", Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

194.    Rather, to the extent that the initial examinations were conducted in the first instance, Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo provided substantially similar, pre-determined "diagnoses" for every Insured, and prescribed a substantially similar course of treatment for every Insured.

195.    Specifically, in almost every instance in the claims identified in Exhibits "1" and "2", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

196.    Even so, Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo prepared initial examination reports in which they provided substantially the same phony, objectively unverifiable soft tissue injury "diagnoses" to virtually every Insured.

197.    Then, based upon these phony "diagnoses", Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo routinely directed the Insureds to return to Totowa Pain or Specialty Medical on a regular basis for medically unnecessary follow-up examinations,

electrodiagnostic testing, and chiropractic, physical therapy, and acupuncture treatments, regardless of their individual circumstances or presentment.

198.    For example:

(i)     On August 17, 2014, an Insured named FO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that FO's vehicle was drivable following the accident. The police report further indicated that FO was not injured and did not complain of any pain at the scene. In keeping with the fact that FO was not seriously injured, FO did not visit any hospital emergency room following the accident. To the extent that FO experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 2, 2014, Totowa Pain and Fontanella purported to perform an initial examination of FO. Fontanella did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fontanella did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fontanella provided FO with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither FO's presenting problems, nor the treatment plan provided to FO by Totowa Pain and Fontanella, presented any risk of significant complications, morbidity, or mortality. To the contrary, FO did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Totowa Pain and Fontanella consisted of medically unnecessary follow-up examinations, electrodiagnostic testing, and chiropractic, physical therapy, and acupuncture services, none of which posed the least bit of risk to FO. Even so, Totowa Pain and Fontanella billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Fontanella engaged in some legitimate, high complexity medical decision-making during the purported examination.

(ii)    On April 6, 2015 an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. Later that day, AM travelled on his own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that AM was briefly observed on an outpatient basis, and was discharged that same day with a muscle spasm diagnosis. To the extent that AM experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 3, 201, Milazzo purported to perform an initial examination of AM. Milazzo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Milazzo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Milazzo

provided AM with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AM's presenting problems, nor the treatment plan provided to AM by Milazzo and Specialty Medical, presented any risk of significant complications, morbidity, or mortality. To the contrary, AM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Milazzo and Specialty Medical consisted of medically unnecessary follow-up examinations, electrodiagnostic testing, and chiropractic, physical therapy, and acupuncture services, none of which posed the least bit of risk to AM. Even so, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Milazzo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)    On June 30, 2015, an Insured named GD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, rear-end collision, and that GD's vehicle was drivable following the accident. The police report further indicated that GD was not injured and did not complain of any pain at the scene. In keeping with the fact that GD was not seriously injured, GD did not visit any hospital emergency room following the accident. To the extent that GD experienced any health problems at all as the result of the accident, they were of low or minimal severity. On October 22, 2015, Milazzo purported to perform an initial examination of GD. Milazzo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Milazzo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Milazzo provided GD with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither GD's presenting problems, nor the treatment plan provided to GD by Milazzo and Specialty Medical, presented any risk of significant complications, morbidity, or mortality. To the contrary, GD did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Milazzo and Specialty Medical consisted of medically unnecessary follow-up examinations, electrodiagnostic testing, and chiropractic, physical therapy, and acupuncture services, none of which posed the least bit of risk to GD. Even so, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Milazzo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)    On January 19, 2016, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health problems at all as the result of the accident, they were of

low or minimal severity. On January 28, 2016, Totowa Pain and Fontanella purported to perform an initial examination of LP. Fontanella did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fontanella did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fontanella provided LP with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LP's presenting problems, nor the treatment plan provided to LP by Totowa Pain and Fontanella, presented any risk of significant complications, morbidity, or mortality. To the contrary, LP did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Totowa Pain and Fontanella consisted of medically unnecessary follow-up examinations, electrodiagnostic testing, and chiropractic and physical therapy services, none of which posed the least bit of risk to LP. Even so, Totowa Pain and Fontanella billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Fontanella engaged in some legitimate, high complexity medical decision-making during the purported examination.

(v)     On March 1, 2016, an Insured named PF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that PF's vehicle was drivable following the accident. The police report further indicated that PF was not injured and did not complain of any pain at the scene. In keeping with the fact that PF was not seriously injured, PF did not visit any hospital emergency room following the accident. To the extent that PF experienced any health problems at all as the result of the accident, they were of low or minimal severity. To the extent that PF experienced any health problems at all as the result of the accident, they were of low or minimal severity. On April 26, 2016, Milazzo purported to perform an initial examination of PF. Milazzo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Milazzo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Milazzo provided PF with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither PF's presenting problems, nor the treatment plan provided to PF by Milazzo and Specialty Medical, presented any risk of significant complications, morbidity, or mortality. To the contrary, PF did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Milazzo and Specialty Medical consisted of medically unnecessary follow-up examinations, none of which posed the least bit of risk to PF. Even so, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Milazzo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)    On June 5, 2016, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact,

rear-end collision, and that JD's vehicle was drivable following the accident. The police report further indicated that JD was not injured and did not complain of any pain at the scene. In keeping with the fact that JD was not seriously injured, JD did not visit any hospital emergency room following the accident. To the extent that JD experienced any health problems at all as the result of the accident, they were of low or minimal severity. To the extent that JD experienced any health problems at all as the result of the accident, they were of low or minimal severity. On June 23, 2016, Milazzo purported to perform an initial examination of JD. Milazzo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Milazzo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Milazzo provided JD with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JD's presenting problems, nor the treatment plan provided to JD by Milazzo and Specialty Medical, presented any risk of significant complications, morbidity, or mortality. To the contrary, JD did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Milazzo and Specialty Medical consisted of medically unnecessary follow-up examinations and chiropractic and physical therapy services, none of which posed the least bit of risk to JD. Even so, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Milazzo engaged in some legitimate medical decision-making during the purported examination.

(vii)    On October 17, 2016, an Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that ER's vehicle was drivable following the accident. The police report further indicated that ER was not injured and did not complain of any pain at the scene. Later that day, ER travelled on his own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that ER was briefly observed on an outpatient basis, and was discharged that same day with a low back pain and muscle spasm diagnosis. To the extent that ER experienced any health problems at all as the result of the accident, they were of low or minimal severity. On October 19, 2016, Totowa Pain and Fontanella purported to perform an initial examination of ER. Fontanella did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fontanella did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fontanella provided ER with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither ER's presenting problems, nor the treatment plan provided to ER by Totowa Pain and Fontanella, presented any risk of significant complications, morbidity, or mortality. To the contrary, ER did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Totowa Pain and Fontanella consisted of medically unnecessary follow-up examinations, electrodiagnostic testing, and chiropractic and physical therapy services, none of

which posed the least bit of risk to ER. Even so, Totowa Pain and Fontanella billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Fontanella engaged in some legitimate, high complexity medical decision-making during the purported examination.

(viii)   On November 15, 2016, an Insured named RR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that RR's vehicle was drivable following the accident. The police report further indicated that RR was not injured and did not complain of any pain at the scene. The next day, RR travelled on her own JFK Medical Center. The contemporaneous hospital records indicated that RR was briefly observed on an outpatient basis, and was discharged that same day with a back pain/strain diagnosis. To the extent that RR experienced any health problems at all as the result of the accident, they were of low or minimal severity. On March 8, 2017, Milazzo purported to perform an initial examination of RR. Milazzo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Milazzo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Milazzo provided RR with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither RR's presenting problems, nor the treatment plan provided to RR by Milazzo and Specialty Medical, presented any risk of significant complications, morbidity, or mortality. To the contrary, RR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Milazzo and Specialty Medical consisted of medically unnecessary follow-up examinations and electrodiagnostic testing, none of which posed the least bit of risk to RR. Even so, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Milazzo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)   On January 19, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of low or minimal severity. On February 1, 2017, Totowa Pain, Hayek, and Fontanella purported to perform an initial examination of AS. Hayek did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hayek did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hayek provided AS with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AS's presenting problems, nor the treatment

plan provided to AS by Totowa Pain, Hayek, and Fontanella, presented any risk of significant complications, morbidity, or mortality. To the contrary, AS did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Totowa Pain, Hayek, and Fontanella consisted of medically unnecessary follow-up examinations and chiropractic and physical therapy services, none of which posed the least bit of risk to AS. Even so, Totowa Pain, Hayek, and Fontanella billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Hayek engaged in some legitimate, high complexity medical decision-making during the purported examination.

(x)     On April 22, 2017, an Insured named MF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that MF's vehicle was drivable following the accident. The police report further indicated that MF was not injured and did not complain of any pain at the scene. In keeping with the fact that MF was not seriously injured, MF did not visit any hospital emergency room following the accident. To the extent that MF experienced any health problems at all as the result of the accident, they were of low or minimal severity. To the extent that MF experienced any health problems at all as the result of the accident, they were of low or minimal severity. On May 10, 2017, Milazzo purported to perform an initial examination of MF. Milazzo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Milazzo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Milazzo provided MF with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither FO's presenting problems, nor the treatment plan provided to MF by Milazzo and Specialty Medical, presented any risk of significant complications, morbidity, or mortality. To the contrary, MF did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Milazzo and Specialty Medical consisted of medically unnecessary follow-up examinations, none of which posed the least bit of risk to MF. Even so, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Milazzo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xi)    On June 2, 2017, an Insured named CP was involved in an automobile accident. The contemporaneous police report indicated that CP was not injured and did not complain of any pain at the scene. In keeping with the fact that CP was not seriously injured, CP did not visit any hospital emergency room following the accident. To the extent that CP experienced any health problems at all as the result of the accident, they were of low or minimal severity. To the extent that CP experienced any health problems at all as the result of the accident, they were of low or minimal severity. On November 29, 2017, Milazzo purported to perform an initial examination of CP. Milazzo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with

the examination. Moreover, Milazzo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Milazzo provided CP with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CP's presenting problems, nor the treatment plan provided to CP by Milazzo and Specialty Medical, presented any risk of significant complications, morbidity, or mortality. To the contrary, CP did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Milazzo and Specialty Medical consisted of medically unnecessary follow-up examinations and electrodiagnostic testing, none of which posed the least bit of risk to CP. Even so, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Milazzo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xii)   On June 24, 2017, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as the result of the accident, they were of low or minimal severity. On June 28, 2017, Totowa Pain and Fontanella purported to perform an initial examination of MB. Fontanella did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fontanella did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fontanella provided MB with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MB's presenting problems, nor the treatment plan provided to MB by Totowa Pain and Fontanella, presented any risk of significant complications, morbidity, or mortality. To the contrary, MB did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Totowa Pain and Fontanella consisted of medically unnecessary follow-up examinations, electrodiagnostic testing, and chiropractic, physical therapy, and acupuncture services, none of which posed the least bit of risk to MB. Even so, Totowa Pain and Fontanella billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Fontanella engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiii)  On September 20, 2017, an Insured named TK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that TK's vehicle was drivable following the accident. The police report further indicated that TK was not injured and did not complain of any pain at the scene. In keeping with the fact that TK was not seriously injured, TK did not visit any hospital emergency room following the accident. To

the extent that TK experienced any health problems at all as the result of the accident, they were of low or minimal severity. On October 11, 2017, Totowa Pain and Fontanella purported to perform an initial examination of TK. Fontanella did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fontanella did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fontanella provided TK with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither TK's presenting problems, nor the treatment plan provided to TK by Totowa Pain and Fontanella, presented any risk of significant complications, morbidity, or mortality. To the contrary, TK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Totowa Pain and Fontanella consisted of medically unnecessary follow-up examinations and chiropractic and physical therapy services, none of which posed the least bit of risk to TK. Even so, Totowa Pain and Fontanella billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Fontanella engaged in some legitimate, high complexity medical decision-making during the purported examination.

(xiv)   On October 6, 2017, an Insured named AU was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that AU's vehicle was drivable following the accident. The police report further indicated that AU was not injured and did not complain of any pain at the scene. In keeping with the fact that AU was not seriously injured, AU did not visit any hospital emergency room following the accident. To the extent that AU experienced any health problems at all as the result of the accident, they were of low or minimal severity. On October 24, 2017, Hayek, Fontanella, and Totowa Pain purported to perform an initial examination of AU. Hayek did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hayek did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hayek provided AU with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AU's presenting problems, nor the treatment plan provided to AU by Hayek and Totowa Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, AU did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Hayek and Totowa Pain consisted of medically unnecessary follow-up examinations and chiropractic, physical therapy, and acupuncture services, none of which posed the least bit of risk to AU. Even so, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Hayek engaged in some legitimate, high complexity medical decision-making during the purported examination.

(xv)    On October 6, 2017, an Insured named AU was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact,

rear-end collision, and that AU's vehicle was drivable following the accident. The police report further indicated that AU was not injured and did not complain of any pain at the scene. In keeping with the fact that AU was not seriously injured, AU did not visit any hospital emergency room following the accident. To the extent that AU experienced any health problems at all as the result of the accident, they were of low or minimal severity. On October 27, 2017, Hayek, Fontanella, and Totowa Pain purported to perform an initial examination of AU. Hayek did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hayek did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hayek provided AU with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AU's presenting problems, nor the treatment plan provided to AU by Hayek and Totowa Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, AU did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Hayek and Totowa Pain consisted of medically unnecessary follow-up examinations and chiropractic and physical therapy services, none of which posed the least bit of risk to AU. Even so, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Hayek engaged in some legitimate, high complexity medical decision-making during the purported examination.

(xvi)   On March 26, 2018, an Insured named GC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that GC's vehicle was drivable following the accident. The police report further indicated that GC was not injured and did not complain of any pain at the scene. In keeping with the fact that GC was not seriously injured, GC did not visit any hospital emergency room following the accident. To the extent that GC experienced any health problems at all as the result of the accident, they were of low or minimal severity. On March 27, 2018, Hayek, Fontanella, and Totowa Pain purported to perform an initial examination of GC. Hayek did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hayek did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hayek provided GC with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither GC's presenting problems, nor the treatment plan provided to GC by Hayek and Totowa Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, GC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Hayek and Totowa Pain consisted of medically unnecessary follow-up examinations and chiropractic and physical therapy services, none of which posed the least bit of risk to GC. Even so, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Hayek engaged in some legitimate, high complexity medical decision-making during the

purported examination.

(xvii)   On April 30, 2018, an Insured named CE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that CE's vehicle was drivable following the accident. The police report further indicated that CE was not injured and did not complain of any pain at the scene. In keeping with the fact that CE was not seriously injured, CE did not visit any hospital emergency room following the accident. To the extent that CE experienced any health problems at all as the result of the accident, they were of low or minimal severity. On May 7, 2018, Hayek, Fontanella, and Totowa Pain purported to perform an initial examination of CE. Hayek did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hayek did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hayek provided CE with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CE's presenting problems, nor the treatment plan provided to CE by Hayek and Totowa Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, CE did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Hayek and Totowa Pain consisted of medically unnecessary follow-up examinations and chiropractic, physical therapy, and acupuncture services, none of which posed the least bit of risk to CE. Even so, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Hayek engaged in some legitimate, high complexity medical decision-making during the purported examination.

(xviii)   On April 30, 2018, an Insured named NR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that NR's vehicle was drivable following the accident. The police report further indicated that NR was not injured and did not complain of any pain at the scene. In keeping with the fact that NR was not seriously injured, NR did not visit any hospital emergency room following the accident. To the extent that NR experienced any health problems at all as the result of the accident, they were of low or minimal severity. On May 7, 2018, Hayek, Fontanella, and Totowa Pain purported to perform an initial examination of NR. Hayek did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hayek did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hayek provided NR with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither NR's presenting problems, nor the treatment plan provided to NR by Hayek and Totowa Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, NR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Hayek and Totowa Pain consisted of medically unnecessary follow-up examinations and

chiropractic, physical therapy, and acupuncture services, none of which posed the least bit of risk to NR. Even so, Hayek, Fontanella, and Totowa Pain billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Hayek engaged in some legitimate, high complexity medical decision-making during the purported examination.

(xix)   On July 9, 2018, an Insured named HA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that HA's vehicle was drivable following the accident. The police report further indicated that HA was not injured and did not complain of any pain at the scene. In keeping with the fact that HA was not seriously injured, HA did not visit any hospital emergency room following the accident. To the extent that HA experienced any health problems at all as the result of the accident, they were of low or minimal severity. On July 31, 2018, Totowa Pain and Fontanella purported to perform an initial examination of HA. Fontanella did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fontanella did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fontanella provided HA with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither HA's presenting problems, nor the treatment plan provided to HA by Totowa Pain and Fontanella, presented any risk of significant complications, morbidity, or mortality. To the contrary, HA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Totowa Pain and Fontanella consisted of medically unnecessary follow-up examinations and chiropractic, physical therapy, and acupuncture services, none of which posed the least bit of risk to HA. Even so, Totowa Pain and Fontanella billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Fontanella engaged in some legitimate, high complexity medical decision-making during the purported examination.

(xx)   On December 28, 2018, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that RC's vehicle was drivable following the accident. The police report further indicated that RC was not injured and did not complain of any pain at the scene. In keeping with the fact that RC was not seriously injured, RC did not visit any hospital emergency room following the accident. To the extent that RC experienced any health problems at all as the result of the accident, they were of low or minimal severity. To the extent that RC experienced any health problems at all as the result of the accident, they were of low or minimal severity. On January 30, 2019, Milazzo purported to perform an initial examination of RC. Milazzo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Milazzo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Milazzo provided RC with substantially the same, phony soft tissue injury "diagnoses" that

he provided to virtually every other Insured. Furthermore, neither RC's presenting problems, nor the treatment plan provided to RC by Milazzo and Specialty Medical, presented any risk of significant complications, morbidity, or mortality. To the contrary, RC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Milazzo and Specialty Medical consisted of medically unnecessary follow-up examinations and chiropractic and physical therapy services, none of which posed the least bit of risk to RC. Even so, Specialty Medical, Milazzo, and Giasullo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Milazzo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

199.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

200.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

201.    As set forth above, in the claims identified in Exhibits "1" and "2", most of the Insureds whom Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo purported to treat were involved in relatively minor, "fender–bender" accidents, to the extent that they were involved in any actual accidents at all.

202.    It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibits "1" and "2" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

203.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting for initial examinations by Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo with substantially identical injuries on or about the exact same dates after their accidents, oftentimes many months after their accidents.

204.    Even so, in keeping with the fact that Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo frequently issued substantially identical "diagnoses", on or about the same date, oftentimes many months after the underlying accidents, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

205.    For example:

(i)     On June 11, 2013, two Insureds – MM and MT – were involved in an automobile accident. Seven months later, MM and MT both presented – incredibly – on the exact same date, January 15, 2014, to Specialty Medical for initial examinations by Milazzo. MM and MT were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MM and MT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Milazzo provided MM and MT with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ii)    On April 5, 2016, two Insureds – KS and JS – were involved in the same automobile accident. Thereafter, KS and JS both presented – incredibly – on the exact same date, April 11, 2016, to Totowa Pain for initial examinations by Fontanella. KS and JS were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that KS and JS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Fontanella provided KS and JS with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iii)   On June 4, 2016, two Insureds – JS and SR – were involved in the same automobile accident. Thereafter, JS and SR both presented – incredibly – on the exact same date, August 17, 2016, to Specialty Medical for initial examinations by Milazzo. JS and SR were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JS and SR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Milazzo provided JS and SR with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iv)     On September 30, 2016, two Insureds – CA and IC – were involved in the same automobile accident. Thereafter, CA and IC both presented – incredibly – on the exact same date, November 22, 2016, to Specialty Medical for initial examinations by Milazzo. CA and IC were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CA and IC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Milazzo provided CA and IC with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(v)      On February 8, 2017, two Insureds – HM and IM – were involved in the same automobile accident. Thereafter, HM presented on April 2, 2018 to Specialty Medical for an initial examination by Milazzo. Later, on April 16, 2018, IM presented to Specialty Medical for an initial examination by Milazzo  HM and IM were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that HM and IM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Milazzo provided HM and IM with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(vi)     On March 7, 2017, two Insureds –VM and AP – were involved in the same automobile accident. Thereafter, VM and AP both presented – incredibly – on the exact same date, March 8, 2017, to Totowa Pain for initial examinations by Hayek. VM and AP were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that VM and AP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Hayek provided VM and AP with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(vii)    On April 22, 2017, two Insureds – MF and RP – were involved in the same automobile accident. Thereafter, MF and RP both presented – incredibly – on the exact same date, May 10, 2017, to Specialty Medical for initial examinations by Milazzo. MF and RP were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MF and RP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Milazzo provided MF and RP with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(viii)   On August 27, 2016, two Insureds – CC and FS – were involved in the same automobile accident. Thereafter, CC and FS both presented – incredibly – on the exact same date, October 20, 2016, to Specialty Medical for initial examinations by Milazzo. CC and FS were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that

CC and FS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Milazzo provided CC and FS with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ix)     On May 18, 2017, two Insureds – ER and CV – were involved in the same automobile accident. Thereafter, CV presented on August 16, 2017 to Specialty Medical for an initial examination by Milazzo. Later, on September 28, 2017, ER presented to Specialty Medical for an initial examination by Milazzo. ER and CV were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that ER and CV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Milazzo provided ER and CV with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(x)      On November 15, 2017, two Insureds – JB and LC – were involved in the same automobile accident. Thereafter, JB and LC both presented – incredibly – on the exact same date, November 16, 2017, to Totowa Pain for initial examinations by Hayek. JB and LC were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JB and LC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Hayek provided JB and LC with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xi)     On January 1, 2018, two Insureds – TM and YM – were involved in the same automobile accident. Thereafter, TM and YM both presented – incredibly – on the exact same date, January 15, 2018, to Specialty Medical for initial examinations by Milazzo. TM and YM were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that TM and YM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Milazzo provided TM and YM with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xii)    On April 14, 2018, two Insureds – SC and DD – were involved in the same automobile accident. Thereafter, SC and DD both presented – incredibly – on the exact same date, July 5, 2018, to Specialty Medical for initial examinations by Milazzo. SC and DD were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SC and DD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Milazzo provided SC and DD with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xiii)  On May 26, 2018, two Insureds – IC and MV – were involved in the same automobile accident. Thereafter, IC and MV both presented – incredibly – on the exact same date, June 27, 2018, to Specialty Medical for initial examinations by Milazzo. IC and MV were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that IC and MV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Milazzo provided IC and MV with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xiv)  On July 12, 2018, two Insureds – GG and VJ – were involved in the same automobile accident. Thereafter, GG and VJ both presented – incredibly – on the exact same date, July 17, 2018, to Totowa Pain for initial examinations by Hayek. GG and VJ were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that GG and VJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Hayek provided GG and VJ with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xv)  On July 23, 2018, two Insureds – NP and YP – were involved in the same automobile accident. Thereafter, NP and YP both presented – incredibly – on the exact same date, August 1, 2018, to Specialty Medical for initial examinations by Milazzo. NP and YP were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that NP and YP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Milazzo provided NP and YP with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

206.   These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" and "2", Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo frequently issued substantially identical "diagnoses", on or about the same date, oftentimes many months after the underlying accidents, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

207.   Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo routinely inserted these false "diagnoses" in their initial examination reports in order to create the

false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants later purported to provide to the Insureds.

208.    In the claims for initial examinations identified in Exhibits "1" and "2", Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo also routinely falsely represented that the initial examinations involved some legitimate, complex medical decision-making in order to provide a false basis to bill for the initial examinations under CPT codes 99244, 99205, 99204, and 99203 because examinations billable under CPT codes 99244, 99205, 99204, and 99203 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

## 2.    The Fraudulent Charges for Follow-Up Examinations at Totowa Pain and Specialty Medical

209.    In addition to their fraudulent initial examinations, Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo typically purported to subject the Insureds in the claims identified in Exhibits "1" and "2" to multiple fraudulent follow-up examinations during the course of Fontanella, Hayek, Totowa Pain, Specialty Medical, Milazzo, and Giasullo's fraudulent treatment and billing protocol.

210.    As set forth in Exhibit "1", Fontanella, Hayek, and Cruz purported to perform virtually all of the putative follow-up examinations at Totowa Pain, which were then billed to GEICO under: (i) CPT code 99213, typically resulting in a charge of between $140.00 and $240.00 for each purported follow-up examination; or (ii) CPT code 99214, typically resulting in a charge of between $160.00 and $240.00 for each purported follow-up examination.

211.    As set forth in Exhibit "2", Milazzo and Santangelo purported to perform virtually all of the putative follow-up examinations at Specialty Medical, which were then billed to GEICO

under: (i) CPT codes 99213, typically resulting in a charge of between $100.00 and $160.00 for each purported follow-up examination; or (ii) CPT code 99214, typically resulting in a charge of $160.00 for each purported follow-up examination.

212.     All of Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Santangelo, Giasullo, and Specialty Medical's billing for their purported follow-up examinations was fraudulent because it misrepresented Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Santangelo, Giasullo, and Specialty Medical's eligibility to collect PIP Benefits in the first instance.

213.     Moreover, and as set forth below, Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Santangelo, Giasullo, and Specialty Medical's charges for the putative follow-up examinations identified in Exhibits "1" and "2" were fraudulent in that they misrepresented the nature, extent, and reimbursability of the examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

214.     For instance, in the claims for follow-up examinations that are identified in Exhibits "1" and "2", Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Santangelo, Giasullo, and Specialty Medical routinely misrepresented the severity of the Insureds' presenting problems.

215.     Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

216.     Pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to a patient's health, or even the patient's life.

217.     Similarly, pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

218.     Pursuant to the CPT Assistant, even the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some real, serious threat to the patient's health.

219.     By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibits "1" and "2" suffered any injuries at all in their minor automobile accidents, the injuries virtually always were garden-variety soft tissue injuries such as sprains and strains.

220.     By the time the Insureds in the claims identified in Exhibits "1" and "2" presented to Totowa Pain or Spine Institute for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

221.     Even so, in the claims for follow-up examinations identified in Exhibits "1" and "2", Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Giasullo, and Specialty Medical routinely billed for their putative follow-up examinations under CPT codes 99214 and 99213, and thereby falsely represented that the Insureds continued to suffer from presenting problems of moderate to high severity or low to moderate severity, despite the fact that the purported examinations were provided many months after the Insureds' minor automobile accidents, and long after any soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

222.     For example:

(i)     On January 19, 2016, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months

of the accident. Even so, following a purported follow-up examination of LP by Milazzo on June 2, 2016 – more than five months after the accident – Specialty Medical, Milazzo, and Giasullo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that LP presented with problems of moderate to high severity.

(ii) On June 5, 2016, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that JD's vehicle was drivable following the accident. The police report further indicated that JD was not injured and did not complain of any pain at the scene. In keeping with the fact that JD was not seriously injured, JD did not visit any hospital emergency room following the accident. To the extent that JD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of JD by Milazzo on October 11, 2016 – more than four months after the accident – Specialty Medical, Milazzo, and Giasullo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that JD presented with problems of moderate to high severity.

(iii) On November 18, 2016, an Insured named AT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that AT's vehicle was drivable following the accident. The police report further indicated that AT was not injured and did not complain of any pain at the scene. The next day, AT travelled on her own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that AT was briefly observed on an outpatient basis, and was discharged that same day with a back pain diagnosis. To the extent that AT experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of AT by Milazzo on April 20, 2017 – more than five months after the accident – Specialty Medical, Milazzo, and Giasullo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that AT presented with problems of moderate to high severity.

(iv) On January 19, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of AS by Hayek on July 6, 2017 – more than six months after the accident – Hayek,

81

Fontanella, and Totowa Pain billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that AS presented with problems of moderate to high severity.

(v)     On April 22, 2017, an Insured named MF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that MF's vehicle was drivable following the accident. The police report further indicated that MF was not injured and did not complain of any pain at the scene. In keeping with the fact that MF was not seriously injured, MF did not visit any hospital emergency room following the accident. To the extent that MF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of MF by Milazzo on October 25, 2017 – more than six months after the accident – Specialty Medical, Milazzo, and Giasullo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that MF presented with problems of moderate to high severity.

(vi)    On June 2, 2017, an Insured named CP was involved in an automobile accident. police report further indicated that CP was not injured and did not complain of any pain at the scene. In keeping with the fact that CP was not seriously injured, CP did not visit any hospital emergency room following the accident. To the extent that CP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. To the extent that CP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of CP by Milazzo on March 28, 2018 – more than nine months after the accident – Specialty Medical, Milazzo, and Giasullo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that CP presented with problems of moderate to high severity.

(vii)   On June 24, 2017, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of MB by Milazzo on December 7, 2017 – more than five months after the accident – Specialty Medical, Milazzo, and Giasullo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that MB presented with problems of moderate to high severity.

(viii)    On September 20, 2017, an Insured named TK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that TK's vehicle was drivable following the accident. The police report further indicated that TK was not injured and did not complain of any pain at the scene. In keeping with the fact that TK was not seriously injured, TK did not visit any hospital emergency room following the accident. To the extent that TK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of TK by Hayek on February 28, 2018 – more than five months after the accident – Hayek, Fontanella, and Totowa Pain billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that TK presented with problems of moderate to high severity.

(ix)    On October 6, 2017, an Insured named AU was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that AU's vehicle was drivable following the accident. The police report further indicated that AU was not injured and did not complain of any pain at the scene. In keeping with the fact that AU was not seriously injured, AU did not visit any hospital emergency room following the accident. To the extent that AU experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of AU by Hayek on April 3, 2018 – more than five months after the accident – Hayek, Fontanella, and Totowa Pain billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that AU presented with problems of moderate to high severity.

(x)    On November 28, 2017, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that RM's vehicle was drivable following the accident. The police report further indicated that RM was not injured and did not complain of any pain at the scene. Later that day, RM travelled on her own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that RM was briefly observed on an outpatient basis, and was discharged that same day with a cervical sprain diagnosis. To the extent that RM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of RM by Hayek on May 23, 2018 – more than five months after the accident – Hayek, Fontanella, and Totowa Pain billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that RM presented with problems of moderate to high severity.

(xi)    On January 3, 2018, an Insured named AV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact

collision, and that AV's vehicle was drivable following the accident. The police report further indicated that although AV complained of back pain, AV refused medical attention at the scene. Later that day, AV travelled on her own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that AV was briefly observed on an outpatient basis, and was discharged that same day with a cervical strain and low back pain diagnosis. To the extent that AV experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of AV by Cruz on June 20, 2018 – more than five months after the accident – Cruz, Fontanella, and Totowa Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that AV presented with problems of low to moderate severity.

(xii)    On March 26, 2018, an Insured named GC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that GC's vehicle was drivable following the accident. The police report further indicated that GC was not injured and did not complain of any pain at the scene. In keeping with the fact that GC was not seriously injured, GC did not visit any hospital emergency room following the accident. To the extent that GC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of GC by Hayek on August 23, 2018 – more than four months after the accident – Hayek, Fontanella, and Totowa Pain billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that GC presented with problems of moderate to high severity.

(xiii)   On April 30, 2018, an Insured named CE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that CE's vehicle was drivable following the accident. The police report further indicated that CE was not injured and did not complain of any pain at the scene. In keeping with the fact that CE was not seriously injured, CE did not visit any hospital emergency room following the accident. To the extent that CE experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved over time after the accident. Even so, following a purported follow-up examination of CE by Hayek on July 5, 2018 – more than two months after the accident – Hayek, Fontanella, and Totowa Pain billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that CE presented with problems of moderate to high severity.

(xiv)    On July 9, 2018, an Insured named HA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that HA's vehicle was drivable following the accident. The police report further indicated that HA was not injured and did not complain of any

pain at the scene. In keeping with the fact that HA was not seriously injured, HA did not visit any hospital emergency room following the accident. To the extent that HA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of HA by Fontanella on January 25, 2019 – more than six months after the accident – Fontanella and Totowa Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that HA presented with problems of low to moderate severity.

(xv)    On December 28, 2018, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that RC's vehicle was drivable following the accident. The police report further indicated that RC was not injured and did not complain of any pain at the scene. In keeping with the fact that RC was not seriously injured, RC did not visit any hospital emergency room following the accident. To the extent that RC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of RC by Milazzo on April 24, 2019 – over three months after the accident – Specialty Medical, Milazzo, and Giasullo billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that RC presented with problems of low to moderate severity.

223.    These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" and "2", Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Giasullo, and Specialty Medical routinely falsely represented that the Insureds presented with problems of low to moderate or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations – which often were many months after the minor accidents – or else their presenting problems were minimal.

224.    In the claims for follow-up examinations identified in Exhibits "1" and "2", Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Giasullo, and Specialty Medical routinely falsely represented that the Insureds presented with problems of moderate to high or low to moderate severity in order to create a false basis for their charges for the putative examinations under CPT

codes 99214 and 99213, because examinations billable under CPT codes 99214 and 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

225.    In the claims for follow-up examinations identified in Exhibits "1" and "2", Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Giasullo, and Specialty Medical also routinely falsely represented that the Insureds presented with problems of moderate to high or low to moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.    Misrepresentations Regarding the Results of the Follow-Up Examinations**

226.    What is more, pursuant to the Fee Schedule, when Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Giasullo, and Specialty Medical submitted charges for the follow-up examinations under CPT code 99213, they represented that they performed at least two of the following three components:  (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

227.    Moreover, pursuant to the Fee Schedule, when Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Giasullo, and Specialty Medical submitted charges for the follow-up examinations under CPT code 99214, they represented that they performed at least two of the following three components:  (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

228.    In actuality, however, in the claims for follow-up examinations identified in Exhibits "1" and "2", Fontanella, Hayek, Cruz, and Milazzo did not take any legitimate patient

histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

229.    Rather, following their purported follow-up examinations, Fontanella, Hayek, Cruz, and Milazzo simply reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations and recommended that the Insureds continue to return to Totowa Pain or Specialty Medical for additional medically unnecessary follow-up examinations, electrodiagnostic testing, chiropractic, physical therapy, and acupuncture treatments.

230.    In keeping with the fact that the putative "results" of the follow-up examinations were phony, and were falsified to support continued, medically unnecessary treatments and procedures by the Defendants, and to provide a false justification for the medically unnecessary tests and treatments that the Defendants already had purported to provide, Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Giasullo, and Specialty Medical routinely falsely purported to diagnose continuing effects of soft tissue injuries in the Insureds long after the minor underlying automobile accidents occurred, and long after any attendant soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

231.    For example:

(i)    On January 19, 2016, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of LP by Fontanella on June 22, 2016 – more than six months after the accident – Fontanella falsely reported that LP continued to suffer from high levels of pain as the result of the minor, six month-old accident, and recommended that LP return to Totowa Pain for the continued provision of the Fraudulent Services.

(ii)     On June 5, 2016, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that JD's vehicle was drivable following the accident. The police report further indicated that JD was not injured and did not complain of any pain at the scene. In keeping with the fact that JD was not seriously injured, JD did not visit any hospital emergency room following the accident. To the extent that JD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of JD by Milazzo on October 11, 2016 – more than four months after the accident – Milazzo falsely reported that JD continued to suffer from high levels of pain as the result of the minor, four month-old accident, and recommended that JD return to Specialty Medical for the continued provision of the Fraudulent Services.

(iii)    On November 18, 2016, an Insured named AT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that AT's vehicle was drivable following the accident. The police report further indicated that AT was not injured and did not complain of any pain at the scene. The next day, AT travelled on her own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that AT was briefly observed on an outpatient basis, and was discharged that same day with a back pain diagnosis. To the extent that AT experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of AT by Milazzo on April 20, 2017 – more than five months after the accident – Milazzo falsely reported that AT continued to suffer from high levels of pain as the result of the minor, five month-old accident, and recommended that AT return to Specialty Medical for the continued provision of the Fraudulent Services.

(iv)     On January 19, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of AS by Hayek on July 6, 2017 – more than six months after the accident – Hayek falsely reported that AS continued to suffer from high levels of pain as the result of the minor, six month-old accident, and recommended that AS return to Totowa Pain for the continued provision of the Fraudulent Services.

(v)      On April 17, 2017, an Insured named VP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact,

rear-end collision, and that VP's vehicle was drivable following the accident. The police report further indicated that VP was not injured and did not complain of any pain at the scene. The next day, VP travelled on her own to Hackensack University Medical Center. The contemporaneous hospital records indicated that VP was briefly observed on an outpatient basis, and was discharged that same day with a minor muscle pain diagnosis. To the extent that VP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of VP by Hayek on November 1, 2017 – more than six months after the accident – Hayek falsely reported that VP continued to suffer from high levels of pain as the result of the minor, six month-old accident, and recommended that VP return to Totowa Pain for the continued provision of the Fraudulent Services.

(vi)     On April 17, 2017, an Insured named VP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that VP's vehicle was drivable following the accident. The police report further indicated that VP was not injured and did not complain of any pain at the scene. The next day, VP travelled on her own to Hackensack University Medical Center. The contemporaneous hospital records indicated that VP was briefly observed on an outpatient basis, and was discharged that same day with a minor muscle pain diagnosis. To the extent that VP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of VP by Milazzo on September 7, 2017 – more than four months after the accident – Milazzo falsely reported that VP continued to suffer from high levels of pain as the result of the minor, four month-old accident, and recommended that VP return to Specialty Medical for the continued provision of the Fraudulent Services.

(vii)    On April 22, 2017, an Insured named MF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that MF's vehicle was drivable following the accident. The police report further indicated that MF was not injured and did not complain of any pain at the scene. In keeping with the fact that MF was not seriously injured, MF did not visit any hospital emergency room following the accident. To the extent that MF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of MF by Milazzo on October 25, 2017 – more than six months after the accident – Milazzo falsely reported that MF continued to suffer from high levels of pain as the result of the minor, six month-old accident, and recommended that MF return to Specialty Medical for the continued provision of the Fraudulent Services.

(viii)   On June 2, 2017, an Insured named CP was involved in an automobile accident. police report further indicated that CP was not injured and did not complain of any

pain at the scene. In keeping with the fact that CP was not seriously injured, CP did not visit any hospital emergency room following the accident. To the extent that CP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset. To the extent that CP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of CP by Milazzo on March 28, 2018 – more than nine months after the accident – Milazzo falsely reported that CP continued to suffer from high levels of pain as the result of the minor, nine month-old accident, and recommended that CP return to Specialty Medical for the continued provision of the Fraudulent Services.

(ix)     On June 24, 2017, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of MB by Milazzo on December 7, 2017 – more than five months after the accident – Milazzo falsely reported that MB continued to suffer from high levels of pain as the result of the minor, five month-old accident, and recommended that MB return to Specialty Medical for the continued provision of the Fraudulent Services.

(x)     On September 20, 2017, an Insured named TK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that TK's vehicle was drivable following the accident. The police report further indicated that TK was not injured and did not complain of any pain at the scene. In keeping with the fact that TK was not seriously injured, TK did not visit any hospital emergency room following the accident. To the extent that TK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of TK by Hayek on February 28, 2018 – more than five months after the accident – Hayek falsely reported that TK continued to suffer from high levels of pain as the result of the minor, five month-old accident, and recommended that TK return to Totowa Pain for the continued provision of the Fraudulent Services.

(xi)     On October 6, 2017, an Insured named AU was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that AU's vehicle was drivable following the accident. The police report further indicated that AU was not injured and did not complain of any pain at the scene. In keeping with the fact that AU was not seriously injured, AU did not visit any hospital emergency room following the accident. To the extent that

AU experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of AU by Hayek on March 14, 2018 – more than five months after the accident – Hayek falsely reported that AU continued to suffer from high levels of pain as the result of the minor, five month-old accident, and recommended that AU return to Totowa Pain for the continued provision of the Fraudulent Services.

(xii)    On November 28, 2017, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that RM's vehicle was drivable following the accident. The police report further indicated that RM was not injured and did not complain of any pain at the scene. Later that day, RM travelled on her own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that RM was briefly observed on an outpatient basis, and was discharged that same day with a cervical sprain diagnosis. To the extent that RM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of RM by Hayek on May 23, 2018 – more than five months after the accident – Hayek falsely reported that RM continued to suffer from high levels of pain as the result of the minor, five month-old accident, and recommended that RM return to Totowa Pain for the continued provision of the Fraudulent Services.

(xiii)   On January 3, 2018, an Insured named AV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AV's vehicle was drivable following the accident. The police report further indicated that although AV complained of back pain, AV refused medical attention at the scene. Later that day, AV travelled on her own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that AV was briefly observed on an outpatient basis, and was discharged that same day with a cervical strain and low back pain diagnosis. To the extent that AV experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of AV by Hayek on July 2, 2018 – more than five months after the accident – Hayek falsely reported that AV continued to suffer from high levels of pain as the result of the minor, five month-old accident, and recommended that AV return to Totowa Pain for the continued provision of the Fraudulent Services.

(xiv)    On March 26, 2018, an Insured named GC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that GC's vehicle was drivable following the accident. The police report further indicated that GC was not injured and did not complain of any pain at the scene. In keeping with the fact that GC was not seriously injured, GC did not visit any hospital emergency room following the accident. To the extent that GC

experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of GC by Hayek on August 23, 2018 – more than four months after the accident – Hayek falsely reported that GC continued to suffer from high levels of pain as the result of the minor, four month-old accident, and recommended that GC return to Totowa Pain for the continued provision of the Fraudulent Services.

(xv)    On April 30, 2018, an Insured named CE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that CE's vehicle was drivable following the accident. The police report further indicated that CE was not injured and did not complain of any pain at the scene. In keeping with the fact that CE was not seriously injured, CE did not visit any hospital emergency room following the accident. To the extent that CE experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of CE by Hayek on July 5, 2018 – more than three months after the accident – Hayek falsely reported that CE continued to suffer from high levels of pain as the result of the minor, three month-old accident, and recommended that CE return to Totowa Pain for the continued provision of the Fraudulent Services.

232.    These are only representative examples. In the substantial majority of the claims for follow-up examinations identified in Exhibits "1" and "2", Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Giasullo, and Specialty Medical falsely represented that the Insureds continued to suffer from pain and other symptoms as the result of their minor automobile accidents, often long after the minor accidents occurred.

233.    In the claims for follow-up examinations identified in Exhibits "1" and "2", Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Giasullo, and Specialty Medical routinely falsely represented that the Insureds continued to suffer pain and other symptoms as the result of minor soft tissue injuries, long after the underlying accidents occurred, because these phony diagnoses provided a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insures.

c.      **Misrepresentations Regarding the Amount of Time Spent on the Follow-Up Examinations**

234.    What is more, every claim for follow-up examinations identified in Exhibits "1" and "2" that was billed under CPT codes 99214 and 99213 misrepresented the amount of time that was spent on the follow-up examinations.

235.    Pursuant to the Fee Schedule, the use of CPT code 99214 to bill for a follow-up examination represents that the physician or chiropractor who conducted the examination spent at least 25 minutes of face-to-face time with the patient or the patient's family.

236.    Pursuant to the Fee Schedule, the use of CPT code 99213 to bill for a follow-up examination represents that the physician who conducted the examination spent at least 15 minutes of face-to-face time with the patient or the patient's family.

237.    As set forth in Exhibits "1" and "2", Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Santangelo, Giasullo, and Specialty Medical frequently billed for their putative follow-up examinations using CPT code and 99213 99214, and thereby represented that the chiropractor who conducted the examinations spent either 15 or 25 minutes of face-to-face time with the Insureds or their families.

238.    In fact, in the follow-up examinations identified in Exhibits "1" and "2", neither Fontanella, Hayek, Cruz, Milazzo, and Santangelo nor any other physician, chiropractor, or acupuncturist associated with Totowa Pain and Specialty Medical ever spent 15 minutes of face-to-face time with the Insureds or their families when conducting the follow-up examinations, much less 25 minutes.

239.    Rather, in the follow-up examinations identified in Exhibits "1" and "2", the follow-up examinations rarely lasted more than 10 minutes, to the extent that they were provided at all.

240.    In keeping with the fact that the follow-up examinations in the claims identified in Exhibits "1" and "2", rarely lasted more than 10 minutes, to the extent that they were conducted at all, Hayek, Cruz, Totowa Pain, Milazzo, Santangelo, Giasullo, and Specialty Medical used template forms in purporting to conduct the examinations.

241.    These template forms set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations, many of which were simply reiterations of what had previously been documented in connection with the purported initial examinations of the patients.

242.    These interviews and examinations did not require any physician, chiropractor, physical therapist, or acupuncturist associated with Totowa Pain and Specialty Medical to spend more than 10 minutes of face-to-face time with the Insureds during the putative follow-up examinations.

243. Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Santangelo, Giasullo, and Specialty Medical routinely misrepresented the amount of time that was spent in conducting the follow-up examinations because lengthier examinations that are billable under CPT codes 99214 and 99213are reimbursable at higher rates than shorter examinations that are billable under other CPT codes.

e.    **Misrepresentations Regarding the Reimbursability of the Follow-Up Examinations Totowa Pain and Specialty Medical**

244.    Not only did Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Santangelo, Giasullo, and Specialty Medical routinely falsely represent that their putative follow-up examinations involved presenting problems of moderate to high severity, and not only did they misrepresent the results of the follow-up examinations, but they also routinely misrepresented the reimbursable amount for the follow-up examinations.

245.    The No-Fault Laws provide that follow-up examinations may only be billed contemporaneously with chiropractic treatments if one of the following four circumstances is present:

(i)     there is a definite measurable change in the patient's condition requiring significant change in the treatment plan;

(ii)    the patient fails to respond to treatment, requiring a change in the treatment plan;

(iii)   the patient's condition becomes permanent and stationary, or the patient is ready for discharge; or

(iv)    it is medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

See N.J.A.C. 11:3-29.4(n).

246.    Even so, Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Santangelo, Giasullo, and Specialty Medical routinely billed for follow-up examinations contemporaneously with chiropractic services, despite: (i) the absence of a definite measurable change in the patient's condition requiring significant change in the treatment plan; (ii) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patient's condition became permanent, or a situation in which the patient was ready for discharge; and (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

247.    For example:

(i)     Totowa Pain, Fontanella, and Hayek billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named FO on September 30, 2014, October 30, 2014, November 25, 2014, December 30, 2014, and January 30, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Totowa Pain, Fontanella, and Hayek were preparing to discharge the patient; and (d) the absence

of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(ii)   Totowa Pain, Fontanella, and Hayek billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named JO on November 12, 2014, December 8, 2014,  February 11, 2015, March 12, 2015,   and April 9, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Totowa Pain, Fontanella, and Hayek were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(iii)   Totowa Pain, Fontanella, and Hayek billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named SB on April 8, 2015, May 6, 2015, June 8, 2015, and July 6, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Totowa Pain, Fontanella, and Hayek were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(iv)   Totowa Pain, Fontanella, and Hayek billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named RC on April 24, 2015, May 28, 2015, and July 6, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Totowa Pain, Fontanella, and Hayek were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(v)   Milazzo, Santangelo, Giasullo, and Specialty Medical billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named JD on July 2, 2016, August 2, 2016, August 30, 2016, September 6, 2017, October 6, 2016, and October 11, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of

any situation in which the patient's condition became permanent, or a situation in which Milazzo, Santangelo, Giasullo, and Specialty Medical were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(vi)     Totowa Pain, Fontanella, and Hayek billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named ER on November 16, 2016, December 15, 2016, January 16, 2017, February 13, 2017, and March 20, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Totowa Pain, Fontanella, and Hayek were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(vii)    Milazzo, Santangelo, Giasullo, and Specialty Medical billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named SG on June 2, 2017, June 26, 2017, July 25, 2017, and July 28, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Milazzo, Santangelo, Giasullo, and Specialty Medical were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(viii)   Totowa Pain, Fontanella, and Hayek billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named TK on November 14, 2017, December 11, 2017, January 10, 2018, and February 28, 2018, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Totowa Pain, Fontanella, and Hayek were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(ix)     Totowa Pain, Fontanella, and Hayek billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named GC on April 24, 2018, June 27, 2018, July 24, 2018, and August 23, 2018, despite: (a) the absence of any definite measurable change in the patient's

condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Totowa Pain, Fontanella, and Hayek were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(x)     Milazzo, Santangelo, Giasullo, and Specialty Medical billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named RC on February 27, 2019, March 27, 2019, and April 24, 2019, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Milazzo, Santangelo, Giasullo, and Specialty Medical were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

248.    These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" and "2", Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Santangelo, Giasullo, and Specialty Medical virtually always billed for follow-up examinations that they purported to provide contemporaneously with chiropractic services, despite: (i) the absence of any definite measurable change in the patients' condition requiring significant change in the treatment plan; (ii) the absence of the patients' failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patients' conditions became permanent, or a situation in which Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Santangelo, Giasullo, and Specialty Medical were preparing to discharge the patients; and (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

249.    Each and every time that Fontanella, Hayek, Cruz, Totowa Pain, Milazzo, Santangelo, Giasullo, and Specialty Medical billed for a follow-up examination that they purported

to provide contemporaneously with chiropractic services constituted a separate violation of N.J.S.A. § 39:6A–4.6, N.J.A.C. 11:3–29.6, and N.J.A.C. 11:3–29.4(n).

### 3.      The Fraudulent Charges for Electrodiagnostic Testing

250.     Based upon the fraudulent, pre-determined findings and diagnoses provided during the initial examinations, Specialty Medical, Milazzo, and Giasullo purported to subject many of the Insureds in the claims identified in Exhibit "2" to a series of medically unnecessary EDX tests, specifically nerve conduction velocity ("NCV") tests and electromyography ("EMG") tests.

251.     Milazzo purported to perform virtually all of the EDX tests at Specialty Medical.

252.     As set forth in Exhibit "2", Specialty Medical, Milazzo, and Giasullo then billed the EDX tests to GEICO under CPT codes 95886, 95910, 95911, 95912, and/or 95913.

253.     In the claims for EDX tests identified in Exhibits "2", the charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the phony boilerplate "findings" and "diagnoses" that Specialty Medical, Milazzo, and Giasullo purported to provide during their phony initial and follow-up examinations.

254.     Moreover, in the claims for EDX tests identified in Exhibit "2", the charges for the EDX tests were fraudulent in that they misrepresented Specialty Medical, Milazzo, and Giasullo's eligibility to collect PIP Benefits in the first instance.

255.     In fact, Specialty Medical, Milazzo, and Giasullo never were eligible to collect PIP Benefits in connection with the claims identified in Exhibit "2", because – as a result of the fraudulent conduct described herein – Specialty Medical, Milazzo, and Giasullo, and the EDX tests were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

a.        **The Human Nervous System and Electrodiagnostic Testing**

256.    The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

257.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

258.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

259.    EMG and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by Specialty Medical, Milazzo, and Giasullo because they were medically necessary to determine whether the Insureds had radiculopathies.

260.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the

"Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

261.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

**b.    The Fraudulent NCV Tests**

262.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

263.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

264.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

265.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies

generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

266.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

267.    In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Specialty Medical, Milazzo, and Giasullo routinely purported to test far more nerves than recommended by the Recommended Policy. Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, Specialty Medical, Milazzo, and Giasullo routinely purported to perform and/or provide: (i) NCV tests of 8 or more motor nerves; (ii) NCV tests of 10 sensory nerves; (iii) multiple H-reflex studies; as well as (iii) multiple F-wave studies.

268.    For example:

(i)     On February 18, 2016, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex studies, and multiple F-wave studies to an Insured named OR, supposedly to determine whether OR suffered from a radiculopathy.

(ii)    On September 7, 2016, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex studies, and multiple F-wave studies to an Insured named JM, supposedly to determine whether JM suffered from a radiculopathy.

(iii)   On October 18, 2016, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex studies, and multiple F-wave studies to an Insured named JL, supposedly to determine whether JL suffered from a radiculopathy.

(iv)    On November 3, 2016, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex

studies, and multiple F-wave studies to an Insured named CC, supposedly to determine whether CC suffered from a radiculopathy.

(v)     On December 8, 2016, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex studies, and multiple F-wave studies to an Insured named MC, supposedly to determine whether MC suffered from a radiculopathy.

(vi)    On March 2, 2017, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex studies, and multiple F-wave studies to an Insured named RV, supposedly to determine whether RV suffered from a radiculopathy.

(vii)   On April 5, 2017, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex studies, and multiple F-wave studies to an Insured named RR, supposedly to determine whether RR suffered from a radiculopathy.

(viii)  On July 18, 2017, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex studies, and multiple F-wave studies to an Insured named JP, supposedly to determine whether JP suffered from a radiculopathy.

(ix)    On August 8, 2017, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex studies, and multiple F-wave studies to an Insured named JV, supposedly to determine whether JV suffered from a radiculopathy.

(x)     On August 15, 2017, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex studies, and multiple F-wave studies to an Insured named LP, supposedly to determine whether LP suffered from a radiculopathy.

(xi)    On September 6, 2017, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex studies, and multiple F-wave studies to an Insured named SG, supposedly to determine whether SG suffered from a radiculopathy.

(xii)   On September 20, 2017, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex studies, and multiple F-wave studies to an Insured named JT, supposedly to determine whether JT suffered from a radiculopathy.

(xiii)  On July 19, 2018, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex studies, and

multiple F-wave studies to an Insured named SC, supposedly to determine whether SC suffered from a radiculopathy.

(xiv)    On August 6, 2018, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex studies, and multiple F-wave studies to an Insured named HM, supposedly to determine whether HM suffered from a radiculopathy.

(xv)    On February 13, 2019, Specialty Medical, Milazzo, and Giasullo purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple H-reflex studies, and multiple F-wave studies to an Insured named YP, supposedly to determine whether YP suffered from a radiculopathy.

269.    These are only representative examples. In the claims for NCV tests identified in Exhibit "2", Specialty Medical, Milazzo, and Giasullo routinely purported to perform and/or provide an excessive number of NCV tests to the Insureds, ostensibly to determine whether the Insureds suffered from radiculopathies.

270.    Specialty Medical, Milazzo, and Giasullo routinely purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCVs were medically necessary to determine whether the Insureds had radiculopathies.

271.    What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

272.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

273.    This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained.

274. This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

275. Specialty Medical, Milazzo, and Giasullo did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

276. Instead, Specialty Medical, Milazzo, and Giasullo applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same exact peripheral nerves and nerve fibers in virtually all of the claims identified in Exhibit "2".

277. Specifically, in virtually every claim for NCV testing identified in Exhibit "2", Specialty Medical, Milazzo, and Giasullo purported to test some combination of the following peripheral nerves and nerve fibers – and, in the substantial majority of cases, all of them – in each Insured to whom they purported to provide NCV tests:

(i)     left and right median motor nerves;

(ii)    left and right peroneal motor nerves;

(iii)   left and right tibial motor nerves;

(iv)   left and right ulnar motor nerves;

(v)    left and right median sensory nerves;

(vi)   left and right radial sensory nerves;

(vii)  left and right superficial peroneal sensory nerves;

(viii) left and right sural sensory nerves; and

(ix)   left and right ulnar sensory nerves

278.     The cookie-cutter approach to the NCVs that Specialty Medical, Milazzo, and Giasullo purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCVs was designed solely to maximize the charges that Specialty Medical, Milazzo, and Giasullo could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

**c.      The Fraudulent EMG Tests**

279.     EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

280.     There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

281.     Specialty Medical, Milazzo, and Giasullo did not tailor the EMGs they purported to provide and/or perform to the unique circumstances of each patient. Instead, they routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentation.

282.   According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

283.   Even if there were any need for any of the EMG tests that Specialty Medical, Milazzo, and Giasullo purported to provide, the nature and number of the EMGs that Specialty Medical, Milazzo, and Giasullo purported to provide frequently grossly exceeded the maximum number of such tests – i.e., EMGs of two limbs – that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

284.   For example:

(i)     On February 18, 2016, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named OR, supposedly to determine whether OR suffered from a radiculopathy.

(ii)    On June 1, 2016, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named SP, supposedly to determine whether SP suffered from a radiculopathy.

(iii)   On September 7, 2016, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named JM, supposedly to determine whether JM suffered from a radiculopathy.

(iv)    On October 18, 2016, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named JL, supposedly to determine whether JL suffered from a radiculopathy.

(v)     On November 3, 2016, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named CC, supposedly to determine whether CC suffered from a radiculopathy.

(vi)    On December 8, 2016, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named MC, supposedly to determine whether MC suffered from a radiculopathy.

(vii)   On March 2, 2017, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named GM, supposedly to determine whether GM suffered from a radiculopathy.

(viii)  On March 2, 2017, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named RV, supposedly to determine whether RV

suffered from a radiculopathy.

(ix)     On April 5, 2017, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named RR, supposedly to determine whether RR suffered from a radiculopathy.

(x)      On July 18, 2017, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named JP, supposedly to determine whether JP suffered from a radiculopathy.

(xi)     On August 2, 2017, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named MF, supposedly to determine whether MF suffered from a radiculopathy.

(xii)    On September 20, 2017, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named JT, supposedly to determine whether JT suffered from a radiculopathy.

(xiii)   On July 19, 2018, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named SC, supposedly to determine whether SC suffered from a radiculopathy.

(xiv)    On August 6, 2018, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named HM, supposedly to determine whether HM suffered from a radiculopathy.

(xv)     On February 13, 2019, Specialty Medical, Milazzo, and Giasullo purported to provide a four–limb EMG to an Insured named YP, supposedly to determine whether YP suffered from a radiculopathy.

285.     These are only representative examples. In the EMG claims identified in Exhibits "2", Specialty Medical, Milazzo, and Giasullo routinely purported to provide and/or perform EMGs on muscles in all four limbs of the Insureds solely to maximize the profits that they could reap from each such Insured.

**d.      The Fraudulent Radiculopathy Diagnoses**

286.     Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large-scale, peer-reviewed 2009

study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

287.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom Milazzo, Giasullo, and Specialty Medical purported to treat.

288.    As a result, the frequency of radiculopathy in all motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is significantly lower than 19 percent.

289.    As set forth above, the substantial majority of the Insureds whom Milazzo, Giasullo, and Specialty Medical purportedly treated did not suffer any serious medical problems as the result of any automobile accident, much less any radiculopathies.

290.    Even so, in the EMG and NCV claims identified in Exhibit "2", Milazzo, Giasullo, and Specialty Medical purported to identify radiculopathies in the substantial majority of the Insureds to whom they purported to provide EMG and NCV testing.

291.    Milazzo, Giasullo, and Specialty Medical purported to arrive at their pre-determined radiculopathy "diagnoses" in order to create the appearance of severe injuries and thereby provide a false justification for the laundry-list of medically unnecessary Fraudulent Services that the Defendants purported to provide.

**4.      The Fraudulent Charges for Chiropractic Services and Physical Therapy Services**

292.    The Defendants' fraudulent scheme was aimed, among other things, at providing as many chiropractic and physical therapy services as possible to the Insureds, without regard for medical necessity or the Care Paths.

293.     Based upon the phony, fabricated "diagnoses" that Totowa Pain, Fontanella, Hayek, Cruz, Specialty Medical, Milazzo, Giasullo, and Santangelo provided during their fraudulent initial examinations and follow-up examinations, Totowa Pain, Fontanella, Hayek, Specialty Medical, Milazzo, Giasullo, and Santangelo purported to subject many Insureds to months of medically unnecessary chiropractic and/or physical therapy services.

294.     As set forth in Exhibit "1", Fontanella and Hayek purported to perform many of the chiropractic and physical therapy services billed to GEICO through Totowa Pain, along with a chiropractor named Dimitrios Doris, D.C. ("Doris") and physical therapists named Ryan Arnado, P.T. ("Arnado") and Christian De La Cruz, P.T. ("De La Cruz").

295.     As set forth in Exhibit "2", Santangelo purported to perform virtually all of the chiropractic and physical therapy services that were billed to GEICO through Specialty Medical.

296.     As set forth in in Exhibits "1" – "2", these physical therapy and chiropractic charges included charges under CPT codes: (i) 97140, for manual therapy; (ii) 98941, for chiropractic manipulation; (iii) 97110, for therapeutic activities; (iv) 97124, for therapeutic activities, as well as charges under Healthcare Common Procedure Coding System ("HCPCS") code G0283 for electrical stimulation.

297.     Like the charges for the other Fraudulent Services, the charges for the chiropractic services and physical therapy services were fraudulent in that the services were medically unnecessary and were performed – to the extent that they were performed at all – solely to financially enrich the Defendants, not to treat or otherwise benefit the Insureds who were subjected to them.

**a.     The Medically Unnecessary Chiropractic and Physical Therapy Services**

298.     Totowa Pain, Fontanella, Hayek, Specialty Medical, Milazzo, Giasullo, and

Santangelo knew that – unless they could create a false basis to provide long-term, medically unnecessary chiropractic and physical therapy services to the Insureds in the claims identified in in Exhibits "1" and "2", their ability to provide such long-term, medically unnecessary treatments would be limited by the Care Paths.

299. Accordingly, Totowa Pain, Fontanella, Hayek, Specialty Medical, Milazzo, Giasullo, and Santangelo used the phony, fabricated "diagnoses" provided during the fraudulent initial and follow-up examinations as a false basis to bill for months and months of medically unnecessary chiropractic treatment and/or physical therapy treatment in gross deviation from the Care Paths.

300. For example:

(i) On August 17, 2014, an Insured named FO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that FO's vehicle was drivable following the accident. The police report further indicated that FO was not injured and did not complain of any pain at the scene. In keeping with the fact that FO was not seriously injured, FO did not visit any hospital emergency room following the accident. To the extent that FO experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over five months of chiropractic treatment. Even so, between September 2014 and February 2015, Fontanella, Hayek, Doris, and Totowa Pain purported to provide FO with over five months of purported chiropractic "treatment".

(ii) On September 29, 2014, an Insured named JO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that JO's vehicle was drivable following the accident. The police report further indicated that JO was not injured and did not complain of any pain at the scene. In keeping with the fact that AA was not seriously injured, JO did not visit any hospital emergency room following the accident. To the extent that JO experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over five months of chiropractic treatment. Even so, between October 2014 and April 2015, Fontanella, Hayek, Doris, and Totowa Pain purported to provide JO with over five months of purported chiropractic "treatment".

(iii)   On March 3, 2015, an Insured named SB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that SB's vehicle was drivable following the accident. The police report further indicated that SB was not injured and did not complain of any pain at the scene. In keeping with the fact that SB was not seriously injured, SB did not visit any hospital emergency room following the accident. To the extent that SB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over five months of chiropractic and physical therapy treatment. Even so, between March 2015 and September 2015, Fontanella, Hayek, Doris, and Totowa Pain purported to provide SB with over five months of purported chiropractic "treatment".

(iv)   On April 6, 2015 an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. Later that day, AM travelled on his own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that AM was briefly observed on an outpatient basis, and was discharged that same day with a muscle spasm diagnosis. To the extent that AM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over five months of chiropractic treatment. Even so, between March 2018 and August 2018, Fontanella, Hayek, Arnado, and Totowa Pain purported to provide AM with over five months of purported chiropractic "treatment".

(v)   On May 28, 2016, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over four months of chiropractic treatment. Even so, between June 2016 and October 2016, Milazzo, Giasullo, Santangelo, and Specialty Medical purported to provide JL with over four months of purported chiropractic "treatment".

(vi)   On October 17, 2016, an Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that ER's vehicle was drivable following the accident. The police report further indicated that ER was not injured and did not complain of any pain at the scene. Later that day, ER travelled on his own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that ER was

briefly observed on an outpatient basis, and was discharged that same day with a low back pain and muscle spasm diagnosis. To the extent that ER experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over five months of chiropractic treatment. Even so, between October 2016 and March 2017, Fontanella, Hayek, Doris, and Totowa Pain purported to provide ER with over five months of purported chiropractic "treatment".

(vii) On January 19, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over six months of chiropractic treatment. Even so, between February 2017 and August 2017, Fontanella, Hayek, Doris, and Totowa Pain purported to provide AS with over six months of purported chiropractic "treatment".

(viii) On February 9, 2017, an Insured named HM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that HM's vehicle was drivable following the accident. The police report further indicated that HM was not injured and did not complain of any pain at the scene. In keeping with the fact that HM was not seriously injured, HM did not visit any hospital emergency room following the accident. To the extent that HM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over six months of chiropractic treatment. Even so, between April 2017 and October 2017, Milazzo, Giasullo, Santangelo, and Specialty Medical purported to provide HM with over six months of purported chiropractic "treatment".

(ix) On April 17, 2017, an Insured named VP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that VP's vehicle was drivable following the accident. The police report further indicated that VP was not injured and did not complain of any pain at the scene. The next day, VP travelled on her own to Hackensack University Medical Center. The contemporaneous hospital records indicated that VP was briefly observed on an outpatient basis, and was discharged that same day with a minor muscle pain diagnosis. To the extent that VP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over seven months of chiropractic and physical therapy treatment. Even

so, between May 2017 and December 2017, Fontanella, Hayek, Doris, Arnado, De La Cruz, and Totowa Pain purported to provide VP with over five months of purported chiropractic "treatment" and nearly one month of purported physical therapy "treatment".

(x)     On June 24, 2017, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over four months of chiropractic treatment. Even so, between June 2017 and November 2017, Fontanella, Hayek, Doris, and Totowa Pain purported to provide MB with over four months of purported chiropractic "treatment".

(xi)     On September 20, 2017, an Insured named TK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that TK's vehicle was drivable following the accident. The police report further indicated that TK was not injured and did not complain of any pain at the scene. In keeping with the fact that TK was not seriously injured, TK did not visit any hospital emergency room following the accident. To the extent that TK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over five months of chiropractic treatment. Even so, between October 2017 and March 2018, Fontanella, Hayek, Doris, and Totowa Pain purported to provide TK with over five months of purported chiropractic "treatment".

(xii)     On November 14, 2017, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and did not complain of any pain at the scene. Later that day, MH travelled on her own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that MH was briefly observed on an outpatient basis, and was discharged that same day with a neck muscle pain diagnosis. To the extent that MH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over six months of chiropractic and physical therapy treatment. Even so, between November 2017 and May 2018, Fontanella, Hayek, Doris, Arnado, De La Cruz, and Totowa Pain purported to provide MH with over five months of purported chiropractic "treatment" and over five months of purported physical therapy "treatment".

(xiii)   On November 28, 2017, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that RM's vehicle was drivable following the accident. The police report further indicated that RM was not injured and did not complain of any pain at the scene. Later that day, RM travelled on her own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that RM was briefly observed on an outpatient basis, and was discharged that same day with a cervical sprain diagnosis. To the extent that RM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over seven months of chiropractic and physical therapy treatment. Even so, between December 2017 and July 2018, Fontanella, Hayek, Doris, Arnado, De La Cruz, and Totowa Pain purported to provide RM with over five months of purported chiropractic "treatment" and nearly one month of purported physical therapy "treatment".

(xiv)   On January 3, 2018, an Insured named AV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AV's vehicle was drivable following the accident. The police report further indicated that although AV complained of back pain, AV refused medical attention at the scene. Later that day, AV travelled on her own to St. Joseph's Regional Medical Center. The contemporaneous hospital records indicated that AV was briefly observed on an outpatient basis, and was discharged that same day with a cervical strain and low back pain diagnosis. To the extent that AV experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over five months of chiropractic treatment. Even so, between January 2018 and July 2018, Fontanella, Hayek, Doris, and Totowa Pain purported to provide AV with over five months of purported chiropractic "treatment".

(xv)   On July 9, 2018, an Insured named HA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that HA's vehicle was drivable following the accident. The police report further indicated that HA was not injured and did not complain of any pain at the scene. In keeping with the fact that HA was not seriously injured, HA did not visit any hospital emergency room following the accident. To the extent that HA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident, and did not require over five months of chiropractic treatment. Even so, between July 2018 and January 2019, Fontanella, Hayek, and Totowa Pain purported to provide HA with over five months of purported chiropractic "treatment".

301.   These are only representative examples. In the claims identified in Exhibits "1" and

"2", Totowa Pain, Fontanella, Hayek, Specialty Medical, Milazzo, Giasullo, and Santangelo routinely purported to provide months and months of medically unnecessary chiropractic treatment and/or physical therapy treatment in gross deviation from the Care Paths.

**b.    The Fraudulent Unbundling of Charges for Hot/Cold Packs**

302.    Pursuant to N.J.A.C. 11:3-29.4, "[a]rtificially separating or partitioning what is inherently one total procedure into subparts that are integral to the whole for the purpose of increasing medical fees is prohibited. Such practice is commonly referred to as 'unbundling' or 'fragmented' billing."

303.    N.J.A.C. 11:3–29.4(g)(2) provides that the application of hot/cold packs under CPT code 97010 is bundled into the payment for other services and shall not be reimbursed separately.

304.    Even so, in order to increase the amount of fraudulent billing they could submit to GEICO and other insurers, Milazzo, Santangelo, Giasullo, and Specialty Medical routinely unbundled billing for the application of hot/cold packs under CPT code 97010 from the underlying physical therapy charges so as to maximize the amount of fraudulent billing they could submit to GEICO.

305.    For example:

(i)     Milazzo, Santangelo, Giasullo, and Specialty Medical unbundled a separate charge of $35.00 for the application of hot/cold packs under CPT code 97010 from a charge under CPT code 97110 for physical therapy services that they purported to provide to an Insured named JD on, among other dates, September 11, 2017, September 13, 2017, and September 18, 2017.

(ii)    Milazzo, Santangelo, Giasullo, and Specialty Medical unbundled a separate charge of $35.00 for the application of hot/cold packs under CPT code 97010 from a charge under CPT code 97110 for physical therapy services that they purported to provide to an Insured named SH on September 18, 2017.

(iii)   Milazzo, Santangelo, Giasullo, and Specialty Medical unbundled a separate charge of $35.00 for the application of hot/cold packs under CPT code 97010 from a charge under CPT code 97110 for physical therapy services that they purported to provide

to an Insured named CC on, among other dates, November 29, 2017 and December 1, 2017.

(iv)     Milazzo, Santangelo, Giasullo, and Specialty Medical unbundled a separate charge of $35.00 for the application of hot/cold packs under CPT code 97010 from a charge under CPT code 97110 for physical therapy services that they purported to provide to an Insured named OP on, among other dates, December 18, 2017, December 20, 2017, January 10, 2018, and January 12, 2018.

(v)      Milazzo, Santangelo, Giasullo, and Specialty Medical unbundled a separate charge of $35.00 for the application of hot/cold packs under CPT code 97010 from a charge under CPT code 97110 for physical therapy services that they purported to provide to an Insured named BP on, among other dates, January 3, 2018, January 5, 2018, and January 8, 2018.

(vi)     Milazzo, Santangelo, Giasullo, and Specialty Medical unbundled a separate charge of $35.00 for the application of hot/cold packs under CPT code 97010 from a charge under CPT code 97110 for physical therapy services that they purported to provide to an Insured named JR on, among other dates, April 20, 2018, April 23, 2018, April 25, 2018, and April 27, 2018.

(vii)    Milazzo, Santangelo, Giasullo, and Specialty Medical unbundled a separate charge of $35.00 for the application of hot/cold packs under CPT code 97010 from a charge under CPT code 97110 for physical therapy services that they purported to provide to an Insured named HM on, among other dates, July 2, 2018, July 9, 2018, and July 11, 2018.

(viii)   Milazzo, Santangelo, Giasullo, and Specialty Medical unbundled a separate charge of $35.00 for the application of hot/cold packs under CPT code 97010 from a charge under CPT code 97110 for physical therapy services that they purported to provide to an Insured named CC on, among other dates, March 11, 2019, March 13, 2019, and March 15, 2019.

(ix)     Milazzo, Santangelo, Giasullo, and Specialty Medical unbundled a separate charge of $35.00 for the application of hot/cold packs under CPT code 97010 from a charge under CPT code 97110 for physical therapy services that they purported to provide to an Insured named DO on, among other dates, August 22, 2019, August 27, 2019, September 3, 2019, and September 5, 2019.

(x)      Milazzo, Santangelo, Giasullo, and Specialty Medical unbundled a separate charge of $35.00 for the application of hot/cold packs under CPT code 97010 from a charge under CPT code 97110 for physical therapy services that they purported to provide to an Insured named MC on, among other dates, August 22, 2019, August 27, 2019, September 3, 2019, and December 12, 2019.

306.    These are only representative examples. In the claims identified in Exhibit "2", Milazzo, Santangelo, Giasullo, and Specialty Medical routinely unbundled billing for the application of hot/cold packs under CPT code 97010 from the underlying physical therapy charges so as to maximize the amount of fraudulent billing they could submit to GEICO.

307.    Each of the unbundled charges for the application of hot/cold packs under CPT code 97010 constituted a separate violation of N.J.S.A. § 39:6A–4.6 and N.J.A.C. 11:3–29.4.

**4.      The Fraudulent Charges for Acupuncture Services**

308.    As set forth in Exhibit "1", based upon the phony, boilerplate "diagnoses" that Totowa Pain, Fontanella, Hayek, and Cruz  provided during their fraudulent initial examinations and follow up examinations, Totowa Pain purported to subject many Insureds to a series of medically unnecessary acupuncture treatments.

309.    In particular, and as set forth in Exhibit "1", these acupuncture treatments typically were billed to GEICO under CPT codes 97810 and 97811.

310.    Cruz purported to personally administer virtually all of the acupuncture treatments at Totowa Pain in the claims identified in Exhibit "1".

311.    Like the charges for the other Fraudulent Services, the charges for the acupuncture treatments identified in Exhibit "1", were fraudulent in that the treatments were medically unnecessary, and were performed – to the extent that they were performed at all – pursuant to the phony, boilerplate "diagnoses" that Totowa Pain, Fontanella, Hayek, and Cruz provided to the Insureds at the conclusion of the putative initial examinations and follow-up examinations.

312.    Moreover, in the claims for acupuncture treatments identified in Exhibit "1", the charges for the acupuncture treatments were fraudulent in that they misrepresented Fontanella, Cruz, and Totowa Pain's eligibility to collect PIP Benefits in the first instance.

313.     In fact, Fontanella, Cruz, and Totowa Pain never were eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because, as a result of the fraudulent scheme described herein, neither they nor the treatments were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

### a.     Legitimate Use of Acupuncture

314.     Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows. Every individual has a unique energy flow ("Chi" or "Qi") or, more particularly, unique patterns of underlying strengths and weaknesses in the flow of Chi that are impacted differently from trauma.  When an individual's unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

315.     The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity. Since every individual has a unique Chi, acupuncture treatment should be individualized. In fact, the differences in each individual's unique patterns of underlying strengths and weaknesses in the flow of Chi should be reflected in different treatment strategies.

316.     Moreover, any legitimate acupuncture treatment requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments. Therefore, adjustments in treatment should be made as treatment progresses over time in order to improve the therapeutic effectiveness of each treatment, and to eventually return the patient to maximum health.

317.     Any legitimate acupuncture treatment also requires meaningful, genuine, and individualized documentation of the: (i) acupuncture examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) patient's  progress throughout the course of treatment.

318.     In contrast to legitimate acupuncture practices, Fontanella, Cruz, and Totowa Pain treated each patient without regard to any individualized treatment strategies, without regard to any necessary adjustments in treatment as treatment progressed over time, and without meaningful, genuine, and individualized documentation of the course of acupuncture treatment.

319.     In fact, no genuine effort was made to treat the Insureds' actual injuries, to properly assess their condition, to monitor their improvement or lack thereof, or to adjust the treatment to reflect the patients' improvement or lack of improvement.

320.     At best, the purported "acupuncture" services provided Fontanella, Cruz, and Totowa Pain consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insured's condition, and instead reflected a predetermined protocol designed to maximize the amount of fraudulent charges the Defendants could submit to GEICO and other insurers.

**b.      The Medically Unnecessary Acupuncture Treatments**

321.     By the time the Insureds in the claims identified in Exhibit "1" presented to Totowa Pain for acupuncture, they either had no presenting problems at all, or their presenting problems consisted of minor sprains and strains that were in the process of resolving.

322.     Even so, in the claims identified in Exhibit "1", Fontanella, Cruz, and Totowa Pain routinely purported to provide Insureds with months and months of medically unnecessary acupuncture services.

323.     Fontanella, Cruz, and Totowa Pain knew that, in order to justify the provision of their putative acupuncture services, they needed to create the appearance that the putative acupuncture services had some therapeutic value for the Insureds to whom they purported to provide those services.

324.     However, Fontanella, Cruz, and Totowa Pain knew that, if their acupuncture records indicated that the Insureds had not experienced any improvement to their physical condition as the result of the acupuncture services, they could not justify the provision of further acupuncture services.

325.     On the other hand, Fontanella, Cruz, and Totowa Pain knew that, if their acupuncture records indicated that the Insureds had experienced too much improvement, they similarly could not justify the provision of further acupuncture services.

326.     In this context, it is highly improbable – to the point of impossibility – that virtually all of the Insureds in the claims for acupuncture services identified in Exhibit "1" would report experiencing the same level of supposed "improvement" as the result of the acupuncture services purportedly provided by Fontanella, Cruz, and Totowa Pain.

327.     Even so, in advance of virtually all of the claims for acupuncture services identified in Exhibit "1", Fontanella, Cruz, and Totowa Pain falsely reported that the Insureds had each reported experiencing "slight" improvement as the result of the preceding services, thereby creating a false justification for further, medically unnecessary acupuncture services.

328.     For example:

(i)     Between October 2016 and February 2017, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 32 different dates to an Insured named CC. In order to create a false justification for the continued provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between October

2016 and February 2017 falsely represented that CC experienced "slight" improvement as the result of the putative acupuncture services.

(ii)     Between December 2016 and March 2017, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 20 different dates to an Insured named ER. In order to create a false justification for the continued provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between December 2016 and March 2017 falsely represented that ER experienced "slight" improvement as the result of the putative acupuncture services.

(iii)    Between February 2017 and May 2017, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 23 different dates to an Insured named MB. In order to create a false justification for the continued provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between February 2017 and May 2017 falsely represented that BT experienced "slight" improvement as the result of the putative acupuncture services.

(iv)     Between May 2017 and August 2017, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 25 different dates to an Insured named LF. In order to create a false justification for the continued provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between May 2017 and August 2017 falsely represented that LF experienced "slight" improvement as the result of the putative acupuncture services.

(v)      Between June 2017 and September 2017, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 15 different dates to an Insured named VP. In order to create a false justification for the continued provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between June 2017 and September 2017 falsely represented that VP experienced "slight" improvement as the result of the putative acupuncture services.

(vi)     Between August 2017 and December 2017, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 31 different dates to an Insured named DF. In order to create a false justification for the continued provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between August 2017 and December 2017 falsely represented that DF experienced "slight" improvement as the result of the putative acupuncture services.

(vii)    Between August 2017 and December 2017, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 32 different dates to an Insured named MB. In order to create a false justification for the continued

provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between August 2017 and December 2017 falsely represented that MB experienced "slight" improvement as the result of the putative acupuncture services.

(viii)   Between September 2017 and December 2017, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 19 different dates to an Insured named WA. In order to create a false justification for the continued provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between September 2017 and December 2017 falsely represented that WA experienced "slight" improvement as the result of the putative acupuncture services.

(ix)   Between October 2017 and April 2018, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 42 different dates to an Insured named AU. In order to create a false justification for the continued provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between October 2017 and April 2018 falsely represented that AU experienced "slight" improvement as the result of the putative acupuncture services.

(x)   Between March 2018 and June 2018, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 23 different dates to an Insured named AV. In order to create a false justification for the continued provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between March 2018 and June 2018 falsely represented that AV experienced "slight" improvement as the result of the putative acupuncture services.

(xi)   Between June 2018 and November 2018, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 44 different dates to an Insured named JM. In order to create a false justification for the continued provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between June 2018 and November 2018 falsely represented that JM experienced "slight" improvement as the result of the putative acupuncture services.

(xii)   Between March 2019 and July 2019, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 31 different dates to an Insured named AT. In order to create a false justification for the continued provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between March 2019 and July 2019 falsely represented that AT experienced "slight" improvement as the result of the putative acupuncture services.

(xiii)  Between May 2019 and September 2019, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 25 different dates to an Insured named EB. In order to create a false justification for the continued provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between May 2019 and September 2019 falsely represented that EB experienced "slight" improvement as the result of the putative acupuncture services.

(xiv)  Between August 2019 and January 2020, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 39 different dates to an Insured named GY. In order to create a false justification for the continued provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between August 2019 and January 2020 falsely represented that GY experienced "slight" improvement as the result of the putative acupuncture services.

(xv)  Between October 2019 and November 2019, Fontanella, Cruz, and Totowa Pain purported to provide acupuncture services on at least 15 different dates to an Insured named RR. In order to create a false justification for the continued provision of acupuncture services, virtually every single one of the acupuncture treatment records generated by Fontanella, Cruz, and Totowa Pain between October 2019 and November 2019 falsely represented that RR experienced "slight" improvement as the result of the putative acupuncture services.

329.   These are only representative examples. In virtually all of the claims for acupuncture services, Fontanella, Cruz, and Totowa Pain falsely represented that the Insureds had experienced "slight" improvement as the result of the putative acupuncture services in order to create a false justification for the continued provision of those services.

**c.   Misrepresentations Regarding the Reimbursable Amount for the Acupuncture Treatments**

330.   Not only did Fontanella, Cruz, and Totowa Pain routinely falsely represent the Insureds' need for acupuncture treatments, but they also virtually always misrepresented the reimbursable amount for the acupuncture treatments themselves.

331.   Specifically, as set forth above and in Exhibit "1", Fontanella, Cruz, and Totowa Pain routinely virtually always billed for their putative acupuncture services using CPT codes 97810 and 97811.

332. The maximum reimbursable amount for CPT code 97810 in northern New Jersey, where Totowa Pain operated, was $43.74, pursuant to the Fee Schedule that was in effect after January 4, 2013.

333. The maximum reimbursable amount for CPT code 97811 in northern New Jersey, where Totowa Pain operated, was $37.49, pursuant to the Fee Schedule that was in effect after January 4, 2013.

334. Even so, in the claims for acupuncture treatments identified in in Exhibit "1", Fontanella, Cruz, and Totowa Pain routinely falsely represented that they were entitled to be paid in excess of the maximum reimbursable amount established by the Fee Schedule for each initial examination that they billed to GEICO under CPT codes 97810 and 97811.

335. In the claims for acupuncture treatments identified in in Exhibit "1", Fontanella, Cruz, and Totowa Pain, routinely billed GEICO for their purported treatments as follows:

(i)    CPT code 97810 – between $80.00 and $125.00 per treatment.

(ii)   CPT code 97811 – $65.00 and $130.00 per treatment.

336. Each and every time in the claims identified in Exhibit "1" that Fontanella, Cruz, and Totowa Pain falsely represented that they were entitled to be paid in excess of the maximum reimbursable amount established by the Fee Schedule for their putative acupuncture treatments constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

337. In the claims identified in Exhibit "1", Fontanella, Cruz, and Totowa Pain routinely falsely represented that they were entitled to be paid in excess of the maximum reimbursable amount established by the Fee Schedule for their putative acupuncture services.

### III.   The Fraudulent Billing Submitted to GEICO

338.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA–1500 forms and treatment reports through Totowa Pain and Specialty Medical, containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

339.   The HCFA–1500 forms and treatment reports were false and misleading, and in violation of the Insurance Fraud Prevention Act, in the following material respects:

(i)     The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants were engaged in unlawful referral schemes; (b) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) the Defendants routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(ii)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants were engaged in unlawful referral schemes; (b) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) the Defendants routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(iii)   The HCFA–1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)   The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

## IV.   **GEICO's Justifiable Reliance**

340.   The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

341.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

342.   For instance, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre–determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to it.

343.   Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were legitimately performed in the first instance.

344.   In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed, to the extent that they are performed at all, pursuant to illegal referral arrangements.

345.   The Defendants operated the scheme through several different entities with different tax identification numbers in order to reduce the volume of fraudulent billing submitted through any one entity, avoid detection, and thereby perpetuate the scheme.

346.   The Defendants hired law firms to pursue collection of the fraudulent charges from

GEICO and other insurers. These law firms routinely filed expensive and time–consuming arbitration against GEICO and other insurers if the charges were not promptly paid in full.

347.    GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially–valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $1,100,000.00.

348.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Totowa Pain and Specialty Medical**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

349.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 348 above.

350.    There is an actual case in controversy between GEICO and both Totowa Pain and Specialty Medical as to whether Totowa Pain and Specialty Medical were in compliance with all significant laws and regulations governing healthcare practice during the time period when billing for the Fraudulent Services was submitted to GEICO.

351.    Totowa Pain and Specialty Medical were not in compliance with all significant laws and regulations governing healthcare practice because: (a) the Defendants were engaged in unlawful referral schemes; (b) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) the Defendants routinely

violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

352.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that from 2013 through the present, Totowa Pain and Specialty Medical were not in compliance with all significant laws and regulations governing healthcare practice in New Jersey.

**SECOND CAUSE OF ACTION**
**Against Totowa Pain, Fontanella, Hayek, and Cruz**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A–1 et seq.))**

353.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 348 above.

354.     In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", Totowa Pain, Fontanella, Hayek, and Cruz knowingly submitted or caused to be submitted HCFA–1500 forms and treatment reports to GEICO that were false and misleading in the following material respects:

(i)      The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants were engaged in unlawful referral schemes; (b) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) the Defendants routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(ii)     The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing

healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants were engaged in unlawful referral schemes; (b) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) the Defendants routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(iii)    The HCFA–1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

355.    Totowa Pain, Fontanella, Hayek, and Cruz's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33–A–7.

356.    As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $750,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

### THIRD CAUSE OF ACTION
**Against Fontanella**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

357.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 348 above.

358.    Totowa Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

359.    Fontanella has knowingly conducted and/or participated, directly or indirectly, in the conduct of Totowa Pain's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over six years seeking payments that Totowa Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in illegal referral schemes; and (vi) neither Totowa Pain nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

360.    Totowa Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Fontanella has operated Totowa Pain, inasmuch as Totowa Pain is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Totowa Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Fontanella continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Totowa Pain to the present day.

361.    Totowa Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Totowa Pain in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

362.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $750,000.00 pursuant to the fraudulent bills submitted through Totowa Pain.

363.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Fontanella, Hayek, Cruz, Specialty Medical, Giasullo, and Milazzo
### (Violation of RICO, 18 U.S.C. § 1962(d))

364.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 348 above.

365.    Totowa Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

366.    Fontanella, Hayek, Cruz, Specialty Medical, Giasullo, and Milazzo were employed by and/or associated with Totowa Pain.

367.    Fontanella, Hayek, Cruz, Specialty Medical, Giasullo, and Milazzo knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Totowa Pain's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over

six years seeking payments that Totowa Pain was not entitled to receive under the No-Fault Laws because: ((i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in illegal referral schemes; and (vi) neither Totowa Pain nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

368.    Fontanella, Hayek, Cruz, Specialty Medical, Giasullo, and Milazzo knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

369.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $750,000.00 pursuant to the fraudulent bills submitted through Totowa Pain.

370.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Totowa Pain, Fontanella, Hayek, and Cruz**
**(Common Law Fraud)**

371.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 348 above.

372.     Totowa Pain, Fontanella, Hayek, and Cruz intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

373.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "1", the representation that the Defendants were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, when in fact they were not; (ii) in every claim identified in Exhibit "1", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "1", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

374.     Totowa Pain, Fontanella, Hayek, and Cruz intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Totowa Pain that were not compensable under New Jersey's No-Fault Laws.

375.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $750,000.00  pursuant to the fraudulent bills submitted by Totowa Pain, Fontanella, Hayek, and Cruz through Totowa Pain.

376.     Totowa Pain, Fontanella, Hayek, and Cruz's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

377.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SIXTH CAUSE OF ACTION
**Against Specialty Medical, Giasullo, and Milazzo**
**(Aiding and Abetting Fraud)**

378.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 348 above.

379.     Specialty Medical, Giasullo, and Milazzo knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Totowa Pain, Fontanella, Hayek, and Cruz.

380.     The acts of Specialty Medical, Giasullo, and Milazzo in furtherance of the fraudulent scheme involve causing unlawful compensation to be paid to Totowa Pain and Fontanella in exchange for patient referrals.

381.     The conduct of Specialty Medical, Giasullo, and Milazzo was significant and material. The conduct of Specialty Medical, Giasullo, and Milazzo was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be

no opportunity for Totowa Pain, Fontanella, Hayek, and Cruz to obtain payment from GEICO and from other insurers.

382.     Specialty Medical, Giasullo, and Milazzo aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Totowa Pain for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

383.     The conduct of Specialty Medical, Giasullo, and Milazzo caused GEICO to pay more than $750,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Totowa Pain.

384.     Specialty Medical, Giasullo, and Milazzo's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

385.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Totowa Pain, Fontanella, Hayek, and Cruz**
**(Unjust Enrichment)**

386.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 348 above.

387.     As set forth above, Totowa Pain, Fontanella, Hayek, and Cruz have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

388.     When GEICO paid the bills and charges submitted or caused to be submitted through Totowa Pain by Totowa Pain, Fontanella, Hayek, and Cruz for PIP Benefits, it reasonably

believed that it was legally obligated to make such payments based on Totowa Pain, Fontanella, Hayek, and Cruz's improper, unlawful, and/or unjust acts.

389.   Totowa Pain, Fontanella, Hayek, and Cruz have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Totowa Pain, Fontanella, Hayek, and Cruz voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

390.   Totowa Pain, Fontanella, Hayek, and Cruz's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

391.   By reason of the above, Totowa Pain, Fontanella, Hayek, and Cruz have been unjustly enriched in an amount to be determined at trial, but in no event less than $750,000.00.

**EIGHTH CAUSE OF ACTION**
**Against Specialty Medical, Milazzo, Giasullo, and Santangelo**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A–1 et seq.))**

392.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 348 above.

393.   In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "2", Specialty Medical, Milazzo, Giasullo, and Santangelo knowingly submitted or caused to be submitted HCFA–1500 forms and treatment reports to GEICO that were false and misleading in the following material respects:

    (i)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants were engaged in unlawful referral schemes; (b) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and

(c) the Defendants routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(ii)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants were engaged in unlawful referral schemes; (b) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) the Defendants routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(iii)    The HCFA–1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

394.    Specialty Medical, Milazzo, Giasullo, and Santangelo's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33–A–7.

395.    As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $400,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## NINTH CAUSE OF ACTION
### Against Milazzo and Giasullo
### (Violation of RICO, 18 U.S.C. § 1962(c))

396.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 348 above.

397.    Specialty Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

398.    Milazzo and Giasullo have knowingly conducted and/or participated, directly or indirectly, in the conduct of Specialty Medical's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over five years seeking payments that Specialty Medical was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an illegal patient referral and self-referral scheme; and (vi) neither Specialty Medical nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

399.    Specialty Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud

are the regular way in which Milazzo and Giasullo have operated Specialty Medical, inasmuch as Specialty Medical is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Specialty Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Milazzo and Giasullo continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Specialty Medical to the present day.

400.     Specialty Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Specialty Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

401.     GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted through Specialty Medical.

402.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
### Against Milazzo, Giasullo, Santangelo, Totowa Pain, and Fontanella
### (Violation of RICO, 18 U.S.C. § 1962(d))

403.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 348 above.

404.     Specialty Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C.

§ 1961(4), that engages in activities which affect interstate commerce.

405.    Milazzo, Giasullo, Santangelo, Totowa Pain, and Fontanella were employed by and/or associated with Specialty Medical.

406.    Milazzo, Giasullo, Santangelo, Totowa Pain, and Fontanella knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Specialty Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over five years seeking payments that Specialty Medical was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an illegal patient referral and self-referral scheme; and (vi) neither Specialty Medical nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

407.    Milazzo, Giasullo, Santangelo, Totowa Pain, and Fontanella knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

408.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted through Specialty Medical.

409.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
**Against Specialty Medical, Milazzo, Giasullo, and Santangelo**
**(Common Law Fraud)**

410.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 348 above.

411.    Specialty Medical, Milazzo, Giasullo, and Santangelo intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

412.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "2", the representation that the Defendants were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, when in fact they were not; (ii) in every claim identified in Exhibit "2", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were

subjected to them; (iv) in many of the claims identified in Exhibit "2", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

413.    Specialty Medical, Milazzo, Giasullo, and Santangelo intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Specialty Medical that were not compensable under New Jersey's No-Fault Laws.

414.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted by Specialty Medical, Milazzo, Giasullo, and Santangelo through Specialty Medical.

415.    Specialty Medical, Milazzo, Giasullo, and Santangelo's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

416.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against Totowa Pain and Fontanella
### (Aiding and Abetting Fraud)

417.    GEICO incorporates, as though fully set forth herein, each and every allegation in

143

paragraphs 1 through 348 above.

418.    Totowa Pain and Fontanella knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Specialty Medical, Milazzo, Giasullo, and Santangelo.

419.    The acts of Totowa Pain and Fontanella in furtherance of the fraudulent scheme involve referring Insureds to Specialty Medical in exchange for unlawful compensation from Specialty Medical, Milazzo, Giasullo, and Santangelo.

420.    The conduct of Totowa Pain and Fontanella was significant and material. The conduct of Totowa Pain and Fontanella was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Specialty Medical, Milazzo, Giasullo, and Santangelo to obtain payment from GEICO and from other insurers.

421.    Totowa Pain and Fontanella aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Specialty Medical for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

422.    The conduct of Totowa Pain and Fontanella caused GEICO to pay more than $400,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Specialty Medical.

423.    Totowa Pain and Fontanella's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

424.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**
**Against Specialty Medical, Milazzo, Giasullo, and Santangelo**
**(Unjust Enrichment)**

425.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 348 above.

426.    As set forth above, Specialty Medical, Milazzo, Giasullo, and Santangelo have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

427.    When GEICO paid the bills and charges submitted or caused to be submitted through Specialty Medical by Specialty Medical, Milazzo, Giasullo, and Santangelo for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Specialty Medical, Milazzo, Giasullo, and Santangelo's improper, unlawful, and/or unjust acts.

428.    Specialty Medical, Milazzo, Giasullo, and Santangelo have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Specialty Medical, Milazzo, Giasullo, and Santangelo voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

429.    Specialty Medical, Milazzo, Giasullo, and Santangelo's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

430.    By reason of the above, Specialty Medical, Milazzo, Giasullo, and Santangelo have been unjustly enriched in an amount to be determined at trial, but in no event less than $400,000.00.

**JURY DEMAND**

431.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A. On the First Cause of Action against Totowa Pain and Specialty Medical, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Totowa Pain and Specialty Medical were not in compliance with all relevant laws and regulations governing healthcare practice during the time period when billing for the Fraudulent Services was submitted to GEICO;

B. On the Second Cause of Action against Totowa Pain, Fontanella, Hayek, and Cruz, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $750,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

C. On the Third Cause of Action against Fontanella, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $750,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D. On the Fourth Cause of Action against Fontanella, Hayek, Cruz, Specialty Medical, Giasullo, and Milazzo, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $750,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E. On the Fifth Cause of Action against Totowa Pain, Fontanella, Hayek, and Cruz, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $750,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Specialty Medical, Giasullo, Milazzo, and Santangelo, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $750,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Totowa Pain, Fontanella, Hayek, and Cruz, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $750,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Specialty Medical, Milazzo, Giasullo, and Santangelo, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $400,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

I.      On the Ninth Cause of Action against Milazzo and Giasullo, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $400,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.      On the Tenth Cause of Action against Milazzo, Giasullo, Santangelo, Totowa Pain, and Fontanella, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $400,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Specialty Medical, Milazzo, Giasullo, and Santangelo, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $400,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against Totowa Pain and Fontanella, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $400,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

M.      On the Thirteenth Cause of Action against Specialty Medical, Milazzo, Giasullo, and Santangelo, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $400,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: February 12, 2021

RIVKIN RADLER LLP


By:     */s/ Gene Y. Kang*
        Gene Y. Kang, Esq.
        Timothy J. Bang, Esq.
        Barry I. Levy, Esq. (to be admitted *pro hac vice*)
        Max Gershenoff, Esq. (to be admitted *pro hac vice*)
        Steven Henesy, Esq. (to be admitted *pro hac vice*)
        25 Main Street, Suite 501
        Court Plaza North
        Hackensack, New Jersey 07601
        (201) 287–2460

4731902.v5